**ASPEN HIGHLANDS SKIING CORPO-RATION and Colorado Compensation Insurance Authority, Petitioners,**

v.

**John J. APOSTOLOU; Industrial Claim Appeals Office; and Director, Division of Labor, Respondents.**

**No. 93SC94.**

Supreme Court of Colorado, En Banc.

Jan. 24, 1994.

Halaby, McCrea & Cross, Margaret D. Keck, Denver, for petitioners.

Ross P. Goldsmith, Denver, Jeremy M. Bernstein, Aspen, for respondent John J. Apostolou.

Gale A. Norton, Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Paul Farley, Deputy Atty. Gen., Mary Karen Maldonado, First Asst. Atty. Gen., James C. Klein, Asst. Atty. Gen., Human Resources Section, Denver, for respondents Indus. Claim Appeals Office and Director, Div. of Labor.

White and Steele, P.C., John M. Lebsack, Michael A. Perales, Denver, for amicus curiae, Colorado Ski Country USA, Inc.

Justice LOHR delivered the Opinion of the Court.

We granted certiorari to review the decision of the Colorado Court of Appeals in *Aspen Highlands Skiing Corporation v. Apostolou,* 854 P.2d 1357 (Colo.App.1992), which sustained an award of workers' compensation benefits to John J. Apostolou. The issue on appeal was whether under the facts of this case, Apostolou was an "employee" of

Aspen Highlands Skiing Corporation (Highlands), and therefore entitled to such benefits, when he was injured while working for Highlands on the ski patrol. We affirm the judgment of the court of appeals.

## I.

John J. Apostolou was employed by Highlands as a part-time ski instructor during the 1989–1990 ski season.[1] As part of his compensation for this work, he was given a photographic identification card (photo ID) that enabled him to ski free at any time at Aspen Highlands.

In January 1990, Highlands told its ski instructors that it needed persons with CPR qualifications[2] and first aid training to work on ski patrol. The ski patrol consisted of two categories of workers: professionals, who worked full-time and were paid a salary, and other workers, who worked part-time, received no monetary compensation, but were given photo IDs that enabled them to ski free at any time at Aspen Highlands.

Apostolou mentioned that he had the requisite qualifications and was referred to the ski patrol director. Because he already had a photo ID, Apostolou negotiated an agreement with the ski patrol director to receive daily ski passes for his girlfriend in exchange for his ski patrol work. The agreement entitled the girlfriend to as many daily ski passes as she was able to use during the period that Apostolou performed ski patrol duties. Each pass had a retail value of $36.00, and Apostolou would not have agreed to work on the ski patrol if the arrangement had not been made.

On February 20, 1990, Apostolou fell while on ski patrol duty, injuring his knees. A week later he underwent surgery on his right knee. As a result of his injuries, Apostolou was unable to continue working as either a ski instructor or a ski patrol person.

Apostolou filed a workers' compensation claim. Highlands and its workers' compensation insurer, Colorado Compensation Insurance Authority (CCIA), contested the claim, asserting that Apostolou was not an employee at the time of his injuries, but was a volunteer, and as such, not entitled to workers' compensation benefits. After a hearing, an administrative law judge (ALJ) concluded that Apostolou was working as an employee of Highlands at the time he was injured and ordered Highlands and CCIA to provide compensation. The Industrial Claim Appeals Panel affirmed the ALJ's order, and the Colorado Court of Appeals, with one judge dissenting, in turn affirmed the order of the Panel. *See Aspen Highlands Skiing Corp. v. Apostolou,* 854 P.2d 1357 (Colo.App. 1992). We granted certiorari to determine whether the ALJ erred in determining that Apostolou was an employee of Highlands at the time he was injured and therefore was entitled to workers' compensation benefits.

## II.

In Colorado, workers' compensation legislation "provides exclusive remedies for compensation of an employee by an employer for work-related injury." *Triad Painting Co. v. Blair,* 812 P.2d 638, 641 (Colo.1991). Under the Workmen's Compensation Act of Colorado (the Act),[3] an employee is entitled to receive compensation for an injury incurred while "performing service arising out of and in the course of his employment," § 8–52–102(1)(b), 3B C.R.S. (1986), and "proximately caused by an injury ... arising out of and in the course of his employment ...," § 8–52–102(1)(c). *See, e.g., Triad,* 812 P.2d at 641; *Popovich v. Irlando,* 811 P.2d 379, 381–82 (Colo.1991). An employee, as relevant here, is defined as "[e]very person in the service of

---

1. The essential facts are set forth in the findings of the administrative law judge and have not been contested on appellate review.

2. Although the record does not expand on the term "CPR," we take notice that this is a common abbreviation for cardiopulmonary resuscitation.

3. The Workmen's Compensation Act of Colorado appears at §§ 8–40–101 to 8–54–127, 3B C.R.S. (1986). It was repealed and reenacted as the Workers' Compensation Act of Colorado, effective July 1, 1990. *See* §§ 8–40–101 to 8–47–209, 3B C.R.S. (1993 Supp.). The present case is governed by the earlier act and amendments effective on or before February 20, 1990, the date Apostolou was injured.

any ... private corporation ... under any contract of hire, express or implied ... but not including any persons who are expressly excluded from [the Act]...." § 8–41–106(1)(b), 3B C.R.S. (1986) (now appearing at § 8–40–202(1)(b), 3B C.R.S. (1993 Supp.)). In 1989, the Colorado legislature amended the Act to exclude a class of persons from the definition of "employee" by adding the following provision: " '[E]mployee' excludes any person who volunteers his time or services as a ski patrol person, a ski instructor, or race crew member for a passenger tramway operator...." Ch. 67, sec. 2, § 8–41–106(5), 1989 Colo.Sess.Laws 409, 410 (now appearing at § 8–40–301(4), 3B C.R.S. (1993 Supp.)).

We first consider whether Apostolou was an "employee" of Highlands under the basic definition of that term. We then address Highlands'[4] argument that Apostolou was not an employee because he was not paid "wages" as that term is defined in the Act. Finally, we address Highlands' contention that Apostolou volunteered his services and therefore was among the persons specifically excluded from the definition of "employee" by the 1989 amendment.

### A.

■ The initial question is whether Apostolou satisfied the basic definition of "employee" as a person "in the service of" Highlands "under any contract of hire, express or implied." See § 8–41–106(1)(b). In Denver Truck Exchange v. Perryman, 134 Colo. 586, 307 P.2d 805 (1957), we noted that "[a] contract of hire is subject to the same rules as other contracts even though workmen's compensation laws are liberally construed in our state." Id. at 593, 307 P.2d at 810.[5] We also stated: " 'A contract is an agreement which creates an obligation. Its essentials are competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.' " Id. at 592, 307 P.2d at 810 (quoting 17 C.J.S. 310, § 1a). A contract of hire may be formed even though not every formality attending commercial contractual arrangements is observed as long as the fundamental elements of contract formation are present. See Rocky Mountain Dairy Products v. Pease, 161 Colo. 216, 220, 422 P.2d 630, 632 (1966).

In Hall v. State Compensation Ins. Fund, 154 Colo. 47, 387 P.2d 899 (1963), a hospital provided free lunches to a person working with a volunteer service unit at the hospital. In holding that the person was not working under a contract of hire, we noted: "She was not under contract—at no time did she expressly or by implication obligate herself to the hospital, nor did the hospital at any time obligate itself to her." Id. at 50, 387 P.2d at 901.

■ Under the facts as found by the ALJ, a contract of hire existed between Aspen and Apostolou. Apostolou negotiated with his employer and agreed to work only in exchange for the benefit of daily passes for his girlfriend. He worked under Highlands' direction, with the expectation of compensation in the form of the daily passes. The ALJ determined that "[i]n essence, [Apostolou] obligated himself to perform ski patrol services for [Highlands] and in return, [Highlands] obligated itself to provide free daily ski passes to [Apostolou] or his designee." Under those circumstances, we conclude that Apostolou worked under a contract of hire and fell within the basic definition of "employee" for the purposes of the Act.

### B.

Highlands, however, urges us to construe the term "employee" as defined in section 8–

---

**4.** The arguments of Highlands and CCIA are the same. Where the context requires, "Highlands" is used to refer to both of these parties.

**5.** The governing rule of construction is now set forth in § 8–43–201, 3B C.R.S. (1993 Supp.), which provides in relevant part:
[T]he facts in a workers' compensation case shall not be interpreted liberally in favor of either the rights of the injured worker or the rights of the employer; and a workers' compensation case shall be decided on its merits.

This provision does not apply to the present case because the legislation took effect July 1, 1991, and is applicable to injuries occurring on or after that date. Ch. 219, secs. 22, 61, § 8–43–201, 1991 Colo.Sess.Laws 1291, 1315, 1342. A substantially similar rule of construction, contained in a declaration of legislative intent and effective July 1, 1990, a date also subsequent to the date of Apostolou's injuries, was first adopted in ch. 62, sec. 1, § 8–40–102, 1990 Colo.Sess.Laws 468, 468–69.

41–106(1)(b) to include the requirement that a "contract of hire," which is an essential part of the definition, must provide for the payment of "wages," and that for this purpose we should employ the definition of "wages" found in ch. 67, sec. 4, § 8–47–101(2), 1989 Colo.Sess.Laws 409, 411.[6] Highlands asserts that such a construction would provide a desirable measure of clarity in distinguishing between employees and persons who volunteer time and services as ski patrol persons and thus are excluded from the definition of employee under section 8–41–106(5) of the Act. *See* part IIC, *infra.* A ski pass is not included in the definition of "wages," so the adoption of Highlands' proposed statutory construction would result in the conclusion that Apostolou was not an employee of Highlands.[7]

■ Highlands' proposed construction finds no support in the statutes. Section 8–47–101(2) appears in a section of the Act providing rules for determining the average weekly wage of an injured employee for the purpose of computing compensation payments. *See* § 8–47–101(1), 3B C.R.S. (1986).[8] There is no suggestion that it was intended

to have any application to the determination of employee status. Moreover, the term "wages" is not used in the definition of "employee" applicable here. *See* § 8–41–106(1)(b), 3B C.R.S. (1986) (an "employee" is "[e]very person in the service of any ... private corporation ... under any contract of hire, express or implied"). Therefore, there is no basis to utilize the definition of "wages" in determining the meaning of the term "employee."[9]

In deciding whether a person is an employee for purposes of workers' compensation laws, other jurisdictions have not found the form of compensation determinative of the existence of an employer-employee relationship. *See* 1B Arthur Larson, *Workmen's Compensation Law* § 47.43(a) (1993); 99 C.J.S. *Workmen's Compensation* § 64 (1958); *see also, e.g., Flamingo Motor Inn v. Indus. Comm'n of Arizona*, 133 Ariz. 200, 650 P.2d 502 (App.1982) (claimant who received a round of drinks in exchange for moving and installing restaurant equipment considered an "employee"); *Betts v. Ann Arbor Public Schools*, 403 Mich. 507, 271 N.W.2d 498

---

6. Ch. 67, sec. 4, § 8–47–101(2), 1989 Colo.Sess. Laws 409, 411, provided in pertinent part:

Whenever the term "wages" is used, it shall be construed to mean the money rate at which the services rendered are recompensed under the contract of hire in force at the time of the injury, either express or implied. The term "wages" shall include reportable tips, the amount of the employee's cost of continuing the employer's group health insurance plan and, upon termination of the continuation, the employee's cost of conversion to a similar or lesser insurance plan, and the reasonable value of board, rent, housing, and lodging received from the employer, the reasonable value of which shall be fixed and determined from the facts by the division in each particular case, *but shall not include any similar advantage or fringe benefit not specifically enumerated above.* If, after the injury, the employer continues to pay any advantage or fringe benefit specifically enumerated in this subsection (2), including the cost of health insurance coverage or the cost of the conversion of such health insurance coverage, such advantage or benefit shall not be included in the determination of the employee's wages so long as the employer continues to make such payment.

(Emphasis added.)

7. Highlands' argument that an agreement to pay "wages" is essential to a contract of hire provid-

ed the rationale for the dissenting opinion in the court of appeals. *See Aspen Highlands*, 854 P.2d at 1361–62 (Rothenberg, J., dissenting).

8. In 1990 the General Assembly repealed and reenacted the Act as the Workers' Compensation Act of Colorado. In doing so, it included in a general definitions section a definition of "wages" essentially the same as that in former § 8–47–101(2), *see* ch. 62, sec. 1, § 8–40–201(19), 1990 Colo.Sess.Laws 408, 470, and removed the definition from the section prescribing the manner of computation of "average weekly wage," ch. 62, sec. 1, § 8–42–102, 1990 Colo.Sess.Laws.

9. We are unable to discern any relationship between the defined term "wages" and the defined term "employee" notwithstanding Highlands' contention that the entire statutory scheme evinces a legislative intent to create such a relationship. In reaching this conclusion we have considered Highlands' argument that adoption of § 8–41–106(5), excluding certain persons who volunteer time and services from classification as employees, in the same bill by which the definition of "wages" was amended to exclude unenumerated "similar advantages" and "fringe benefits" in some way suggests the relationship for which Highlands contends. *See* ch. 67, sec. 2, § 8–41–106(5), and sec. 4, § 8–41–106(5), and

(1978) (claimant paid in form of training, college credits, and the meeting of prerequisites for the state teaching requirements was an "employee"). Accordingly, we reject the argument that an employment contract must provide for the payment of "wages" in order that one employed under such a contract may qualify as an "employee" under the Act.

### C.

We now turn to Highlands' principal argument for reversal: that Apostolou was expressly excluded from the definition of "employee" by legislative amendment in 1989 as a "person who volunteers his time or services as a ski patrol person ... for a passenger tramway operator...." *See* ch. 67, sec. 2, § 8–41–106(5), 1989 Colo.Sess.Laws 409, 410. As the ALJ noted, it is undisputed that Highlands is a passenger tramway operator. The crucial question is whether Apostolou volunteered his time or services within the meaning of the statutory exclusion.

■ Familiar principles guide us in construing a statute. Foremost among them is that our task is to determine and give effect to the intent of the legislature. *Property Tax Adm'r v. Production Geophysical Services, Inc.*, 860 P.2d 514, 517 (Colo.1993); *People v. Schuett*, 833 P.2d 44, 47 (Colo.1992). This intention is to be determined primarily from the statutory language, giving effect to the statutory terms in accordance with their commonly accepted and understood meanings. *Schuett*, 833 P.2d at 47; *Binkley v. People*, 716 P.2d 1111, 1113 (Colo.1986). Words or phrases that have acquired a technical or particular meaning, however, whether by legislative definition or otherwise, must be construed in accordance with the acquired meaning. *Binkley*, 716 P.2d at 1113; § 2–4–101, 1B C.R.S. (1980). Statutes susceptible to more than one interpretation are ambiguous and must be construed in light of the

legislative intent and purpose. *Estate of David v. Snelson*, 776 P.2d 813, 817 (Colo. 1989); *Engelbrecht v. Hartford Accident & Indem. Co.*, 680 P.2d 231, 233 (Colo.1984). If statutory language is ambiguous, a court may consider the legislative history in determining the intent of the legislature. *Griffin v. S.W. Devanney & Co.*, 775 P.2d 555, 559 (Colo.1989); § 2–4–203(1)(c), 1B C.R.S. (1980).

■ The common definition of "volunteer" is "[a] person who gives his services without any express or implied promise of remuneration." *Black's Law Dictionary* 1576 (6th ed. rev. 1990). Highlands contends, however, that the legislature intended "any person who volunteers his time or services as a ski patrol person," within the context of section 8–41–106(5), to include all those persons who work on ski patrol duty without monetary compensation but who receive ski passes entitling them to ski free at any time. It asserts that a ski pass is not remuneration, but a fringe benefit regularly given to "volunteers" within the ski industry,[10] that this practice was recognized by the legislature when it adopted section 8–41–106(5), and that the legislature did not intend the receipt of a ski pass to preclude application of the exclusion.[11]

We find it unnecessary to determine whether ski patrol workers who receive ski passes for personal use as a gratuity consistent with an allegedly standard practice of a passenger tramway operator are excluded from the definition of employee by section 8–41–106(5), for the facts do not correspond to any such practice. Apostolou did not receive a ski pass for himself as a standard fringe benefit provided to persons whose services are otherwise uncompensated. Instead, he specifically bargained for daily passes to be issued to his girlfriend, would not have worked on the Highlands ski patrol absent an agreement by Highlands to issue such

sec. 4, § 8–47–101(2), 1989 Colo.Sess.Laws 409, 410, 411.

**10.** The evidence in the record sheds no light on the industry practices with respect to the nature and scope of benefits provided to unsalaried ski patrol workers.

**11.** Our review of the limited legislative history available reveals only that the senate committee

that considered the 1989 amendment heard testimony that ski areas rely heavily on "volunteers" and that the amendment, which was proposed by the ski industry, was intended to exclude "volunteers" from classification as employees for the purpose of workers' compensation. *See Hearings on H.B. No. 1322 before Senate Business Affairs & Labor Committee*, 57th Gen. Assembly, 1st Reg. Sess. (Audiotape, March 6, 1989).

passes, and entered into an agreement with Highlands involving mutual obligations. Apostolou obligated himself to perform ski patrol services, and Highlands obligated itself to provide the ski passes. The ALJ specifically addressed the issue of whether Apostolou volunteered his time and services and made the following findings and conclusions:

> The respondent-employer [Highlands] approached its workers, including the claimant [Apostolou], seeking persons with CPR and first aid knowledge. The claimant, possessing such a background, was sent to interview with Mr. Smith, the director of the ski patrol. During the interview, the claimant expressed his reluctance to perform ski patrol duties if he was to receive only another photo ID ski pass since he already possessed one. As Mr. Smith was unwilling or unable to issue a photo ID ski pass to the claimant's girlfriend, it was agreed between the claimant and Mr. Smith that the claimant would receive unlimited free daily ski passes in return for performing duties as a ski patrolman. In essence, the claimant obligated himself to perform ski patrol services for the respondent-employer and in return, the respondent-employer obligated itself to provide free daily ski passes to the claimant or his designee. If such an arrangement had not been made available to the claimant, he would not have performed duties as a ski patrolman. The daily ski pass is valued at $36.00. If the claimant worked eight hours per day and obtained a ski pass for each day that he worked, the financial return for his performance of ski patrol duties would be $4.50 per hour. Under these circumstances, it cannot be concluded that the claimant volunteered his services to the respondent-employer. Rather, it is concluded that the claimant was an employee of the respondent-employer when he injured his knees on February 20, 1990, while performing duties as a ski patrolman.

The factual findings in the ALJ's order are fully supported by substantial evidence in the record and are therefore binding on this court. *See Fulton v. King Soopers*, 823 P.2d 709, 712–13 (Colo.1992). Based on these facts, we conclude that Apostolou did not volunteer his services within the common meaning of that phrase and that the special meaning urged by Highlands even if accepted is not applicable. Accordingly, we agree with the conclusion of the ALJ, as did the court of appeals, that under the facts as found in the ALJ's ruling, it cannot be concluded that Apostolou volunteered his services to Highlands within the meaning of section 8–41–106(5).

### III.

We hold that the ALJ correctly concluded that Apostolou was an employee of Highlands at the time he was injured based on the facts as he found them. We find it unnecessary and inappropriate to go beyond the facts of this case in delineating the scope of the exclusion in section 8–41–106(5).

We affirm the judgment of the Colorado Court of Appeals.

VOLLACK, J., dissents and ROVIRA, C.J., and SCOTT, J., join in the dissent.

### Justice VOLLACK, dissenting:

The majority holds that, because the claimant, John Apostolou, bargained for his position as a member of the ski patrol in exchange for ski passes for his girlfriend, he is not a "volunteer" under section 8–40–301(4), 3B C.R.S. (1993 Supp.), and is thus not excluded from receiving workers' compensation benefits. The majority affirms the decision of the administrative law judge that Apostolou was an employee of Aspen Highlands for purposes of receiving benefits under the Workers' Compensation Act, and was not a volunteer under the statute. Because I believe that, by the language of the statute, the legislature clearly intended to exclude someone in Apostolou's position from benefits, and because I do not believe an employment relationship was created between the parties, I dissent.

### I.

The principal question in this case is whether Apostolou was an employee or a volunteer under the terms of the Workers'

Compensation Act[1] when he was a member of the ski patrol at Aspen Highlands. The administrative law judge (the ALJ) decided, and the majority affirms, that Apostolou was an employee of the resort. The issue of whether Apostolou was an employee is a question of law, not of fact. The finding of the ALJ on this issue is not binding on this court. *Brush Hay and Milling Co. v. Small*, 154 Colo. 11, 388 P.2d 84 (1963). The ALJ interpreted section 8–40–301(4) as excluding Apostolou from the statute's "volunteer" classification. In questions of statutory interpretation, this court is not bound by the ALJ's determination. *Transponder Corp. of Denver v. Property Tax Adm'r*, 681 P.2d 499 (Colo.1984).

Section 8–40–301(4) of the Workers' Compensation Act states in its entirety: " 'Employee' excludes any person who volunteers time or services as a ski patrol person, a ski instructor, or race crew member for a passenger tramway operator, as defined in section 25–5–702(3), C.R.S."

A court must give effect to statutory terms in accordance with their commonly accepted and understood meanings. *Binkley v. People*, 716 P.2d 1111 (Colo.1986). When the meaning of a statutory provision is plain and free from ambiguity, its language is not subject to interpretation. *American Metal Climax, Inc. v. Claimant of Butler*, 188 Colo. 116, 532 P.2d 951 (1975); *People v. Mascarenas*, 706 P.2d 404 (Colo.1985). Forced, subtle, strained, or unusual interpretation should never be resorted to where the language of the statute is plain, its meaning is clear, and no absurdity is involved. *Harding v. Industrial Comm'n*, 183 Colo. 52, 515 P.2d 95 (1973).

I find the meaning of section 8–40–301(4) to be clear and free from ambiguity. By its terms, a volunteer member of the ski patrol is not an employee for the purposes of receiving workers' compensation benefits. Apostolou, as a volunteer member of the ski patrol, is not an employee under the statute.

Aspen Highlands maintains that it is industry practice for volunteer members of the ski patrol to receive free ski passes in exchange for their services. Apostolou does not dispute this assertion, and I find no reason to question it.[2] Based on the record, there are two classes of ski patrol members: paid members who are employees of a resort, and volunteers whose only recompense consists of a free ski pass. Few, if any, ski patrol members perform their services in exchange for absolutely nothing. The legislature, therefore, must have meant to include in the statutory category of "volunteers" those ski patrol members who receive ski passes in exchange for their services.[3]

## II.

The majority attempts to differentiate Apostolou from other volunteer ski patrol members covered under the statute. For example, the majority concludes, based on the ALJ's findings, that Apostolou would not have agreed to become a volunteer member of the ski patrol if he did not receive the passes. The majority ignores the fact, however, that, given industry practice, very few people would volunteer to be members of the ski patrol if they did not receive free ski passes. Apostolou is no different from other ski patrol volunteers in this respect.

The record reveals that since Apostolou already had a ski pass because of his position as a part-time ski instructor, he negotiated for ski passes for his girlfriend to use when

1. §§ 8–40–101 to 8–54–127, 3B C.R.S. (1986 & 1993 Supp.).

2. Because the matter arose through the administrative hearing process and not by trial, the record available on review is limited.

3. The term "volunteer" is not defined in the Workers' Compensation Act. However, *Black's Law Dictionary* 1413 (5th ed. 1979), defines volunteer as "a person who gives his [or her] services without any express or implied promise of remuneration." According to 1B Arthur Larson, *Workmen's Compensation Law* § 47.43(a) (1992), unless the parties so intend, gratuities and discounts do not constitute the equivalent of wages and are not considered remuneration under an employment contract. Because of the clear statutory language excluding Apostolou from workers' compensation benefits, however, it is not necessary to reach the issue of whether the parties intended to create an employment contract or intended that the ski passes received by Apostolou's girlfriend were the equivalent of wages.

she visited him for two weeks in January. In the end, however, he received the equivalent of what the other ski patrol members received: a free ski pass.[4]

The only difference, then, between Apostolou and other ski patrol members is the "bargaining" aspect of the transaction. The majority opinion concludes that, because Apostolou "bargained" for his girlfriend's ski passes in exchange for his services, he is different from those ski patrol volunteers who received the passes without additional bargaining. Relying on this distinction, the majority excludes Apostolou from section 8–40–301(4). The majority focuses on the process through which Apostolou received his ski passes and concludes that his additional bargaining created an implied employment contract with Aspen Highlands.

I do not believe that an employment relationship exists solely because there has been bargaining between the parties. By its reasoning, the majority creates a new class of people covered under the Workers' Compensation Act: those who are nominally volunteers—who receive no wages or other substantial compensation—but who have "bargained" for some aspect of their relationship with the employer. This is a nebulous categorization and will only serve to create confusion for administrative agencies and to alter the relationship between employers and their employees and volunteers. How much bargaining has to take place before an "employment" relationship is created? Will negotiations over a volunteer's work schedule suffice? I submit that there is always some element of bargaining that occurs between volunteers and the organization for which they work, whether it is over scheduling,

fringe benefits, or any other condition of the working environment. Bargaining, alone, cannot elevate a volunteer to the status of an employee who is eligible for workers' compensation benefits.

### III.

Apostolou is a sympathetic claimant. His injury prevented him from working for eight months. At the time of the hearing he had accumulated over $15,000 in medical bills, and it was possible that he needed additional surgery. The majority, however, should not create a legal fiction that Apostolou was an employee of Aspen Highlands so that he may collect workers' compensation benefits. The statutory language is clear: volunteer ski patrol members are not "employees" under the Workers' Compensation Act. The majority circumvents section 8–40–301(4) and, through judicial fiat, creates a new class of employees to receive workers' compensation benefits: those who have "bargained" for some condition of their volunteer position. In my opinion, the legislature clearly intended, by the language of the statute, that someone in Apostolou's circumstances was not entitled to workers' compensation benefits. I dissent.

I am authorized to say that Chief Justice ROVIRA and Justice SCOTT join in this dissent.

---

4. In fact, his bargaining resulted in his receiving *less* than what the other ski patrol members obtained for their services: his girlfriend used the complimentary passes only four to ten times.

After her visit ended, Apostolou received no more ski passes, even though he continued to volunteer until his injury, which occurred three weeks later.