**ALLSTATE INSURANCE COMPANY, a Colorado corporation, Plaintiff–Appellant,**

v.

**SCHNEIDER NATIONAL CARRIERS, INC., a Nevada corporation and Robert Westfall, Defendants–Appellees.**

No. 96CA0621.

Colorado Court of Appeals, Div. IV.

May 1, 1997.

Rehearing Denied May 29, 1997.

Certiorari Granted Aug. 25, 1997.

Walberg & Dagner, P.C., Randall S. Herrick-Stare, Englewood, for Plaintiff-Appellant.

Treece, Alfrey, Musat & Bosworth, P.C., June Baker Laird, Carol Lynn Thomson, Denver, for Defendants-Appellees.

Opinion by Judge KAPELKE.

Plaintiff, Allstate Insurance Co., (insurer) challenges the summary judgment entered in favor of defendants, Schneider National Carriers, Inc., and Robert Westfall, determining that insurer has no right of subrogation allowing it to seek reimbursement for personal injury protection (PIP) benefits it paid to its insured under the Colorado Auto Accident Reparations Act, § 10–4–701, et seq., C.R.S. (1994 Repl.Vol. 4A) (No–Fault Act). We reverse.

The parties stipulated to the following facts. An accident took place on July 30, 1993, between an automobile insured by plaintiff and a tractor–trailer owned by defendant Schneider National Carriers and driven by defendant Westfall. Passengers in the automobile suffered injuries, and plaintiff provided them with PIP benefits.

Insurer filed this action to obtain reimbursement from defendants for the PIP benefits it paid its insureds, alleging that defendant Westfall's negligence caused the injuries and that he was acting within the scope of his employment with Schneider National Carriers at the time of the accident.

Defendants moved for summary judgment, arguing that insurer was not entitled to subrogation under § 10–4–713(2), C.R.S. (1994 Repl.Vol. 4A) because defendant's vehicle was not a "nonprivate passenger motor vehicle" according to the plain meaning of that phrase. The trial court granted the motion. This appeal followed.

## I.

Insurer contends that the trial court erred in determining that a commercial tractor trailer was not a "nonprivate passenger motor vehicle" under the terms of § 10–4–713(2)(a), C.R.S. (1994 Repl.Vol. 4A). Specifically, insurer urges that the quoted phrase is ambiguous and that the trial court should therefore have considered extrinsic aids such as legislative history in construing the statute. We agree.

## A.

■ A court's foremost task in construing a statute is to carry out the intent of the General Assembly. This intention is to be determined primarily from the statutory language, giving effect to the statutory terms in accordance with their commonly accepted and understood meaning. If the legislative intent is immediately conveyed by the commonly understood and accepted meaning of the statutory language, a court need look no further and must give effect to the statute as written. *Colby v. Progressive Casualty Insurance Co.*, 928 P.2d 1298 (Colo.1996).

At the time of the events at issue here, § 10–4–713(2) provided, in pertinent part:

(a) [W]here a motor vehicle accident involves a private passenger motor vehicle ... and a nonprivate passenger motor vehicle, the insurer of the private passenger motor vehicle ... shall have a direct cause of action for all [PIP] benefits actually paid by such insurer ... against the owner, user or operator of the nonprivate passenger motor vehicle or against any person legally responsible for the acts or omissions of such owner, user or operator....

. . . .

(c) For the purposes of this subsection (2), 'private passenger motor vehicle' means an automobile of the private passenger, station wagon, or camper type not used as a public or livery conveyance, unless such public or livery conveyance is regulated by the public utilities commission ... and is insured under a certificate of self-insurance ... or an automobile of the panel,

delivery, or truck type with a rated load capacity of one thousand five hundred pounds or less.

In *Filippi v. Farmers Insurance Exchange,* 943 P.2d 24 (Colo.App. No. 95CA0924, Oct. 10, 1996) (1996 WL 580424), a division of this court concluded that the phrase "nonprivate passenger motor vehicle" as used in § 10–4–713(2)(a) is unambiguous by its plain language. The division held that the prefix "non" applies only to the word "private" and noted that in ordinary usage the phrase "passenger motor vehicle" means a vehicle used to transport passengers.

The *Filippi* division concluded that, because a tractor trailer is used to transport property rather than passengers, it cannot qualify as a "nonprivate passenger motor vehicle" under § 10–4–713(2). Because it deemed the statutory language at issue unambiguous, the *Filippi* panel declined to consider extrinsic aids to construction such as the legislative history of the NoFault Act.

Because we conclude that the interpretation in *Filippi* conflicts with the General Assembly's intent in enacting the provision, we decline to follow that decision and reach a contrary result here.

■■■ Words or phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, must be construed in accordance with the acquired meaning. *Aspen Highlands Skiing Corp. v. Apostolou,* 866 P.2d 1384 (Colo.1994). When a statute defines a term, that term must be given its statutory meaning wherever it appears in the statute, except where a contrary intention plainly occurs. *R.E.N. v. City of Colorado Springs,* 823 P.2d 1359 (Colo.1992). To ignore a definition section is to refuse to give legal effect to a part of the statutory law of the state. 1A N. Singer, *Sutherland Statutory Construction* § 27.02 (5th ed. 1992).

■■ Here, § 10–4–713(2)(c), C.R.S. (1994 Repl.Vol. 4A) provides a technical definition of "private passenger motor vehicle." Moreover, this statutorily-defined phrase is fully included within the phrase "*non* private passenger motor vehicle." We are therefore required to incorporate, to the extent possible, the statutory definition in our construction of the language in question. *R.E.N. v. City of Colorado Springs, supra.*

We further note that the statutory definition of "private passenger motor vehicle" is at odds with the commonly understood meaning of that phrase. The definition in § 10–4–713(2)(c) includes not only passenger vehicles, as ordinarily defined, but also small cargo vehicles usually considered to be trucks, panel vans, or delivery vans.

Because the definition of "private passenger motor vehicles" includes both passenger and certain cargo vehicles, we cannot agree with the conclusion of the *Filippi* division that "nonprivate passenger motor vehicles" refers only to passenger motor vehicles, in the ordinary sense of that term.

### B.

■■ More importantly, we disagree with the *Filippi* division's conclusion that the phrase "nonprivate passenger motor vehicle" can be read to have but one meaning in this context. In our view, the tension between the ordinary meaning of the phrase and the technical definition provided in the statute creates an ambiguity that cannot be resolved solely by parsing the statutory language.

■■ Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses. 2A N. Singer, *Sutherland Statutory Construction* § 45.02 (5th ed. 1992). If statutory language is susceptible of alternate constructions, a court should consider tools of statutory construction, such as legislative history, to discern the intent of the General Assembly. *Colby v. Progressive Casualty Insurance Co., supra.*

Here, when the statutory definition of "private passenger motor vehicle" provided in § 10–4–713(2)(c) is taken into account, at least three possible interpretations of the phrase "nonprivate passenger motor vehicle" become apparent, none of which is foreclosed by the language of the statute itself.

First, the phrase may denote any motor vehicle that is not a "private passenger motor vehicle" as defined in § 10–4–713(2)(c). This

construction presupposes that the prefix "non" modifies the entire phrase, and not simply the word "private."

Second, the prefix "non" could be read to negate only the word "private," leaving the remainder of the statutorily defined phrase "passenger motor vehicle" intact. Under this reading, the phrase "nonprivate passenger motor vehicle" would denote any government-owned passenger vehicle or small cargo vehicle with a rated load capacity under 1500 pounds.

Third, one could conclude that the negation of the word "private" renders the statutory definition of "private passenger motor vehicle" no longer applicable, and revert to the common usage of the individual words. Under this reading, which the division adopted in *Filippi*, the phrase "nonprivate passenger motor vehicle" denotes government-owned passenger vehicles such as police cruisers, but not light cargo trucks.

Thus, while the phrase "nonprivate passenger motor vehicle" might appear unambiguous when only its common usage is considered, it becomes ambiguous in the context here because of the specific definition of "private passenger motor vehicle" provided by the General Assembly. *See Smith v. Simpson*, 648 P.2d 677 (Colo.App.1982) (No–Fault Act's definition of "pedestrian" renders that term sufficiently ambiguous to require resort to statutory construction). We therefore conclude that proper interpretation of the phrase "nonprivate passenger motor vehicle" requires consideration of the legislative history of the No–Fault Act.

## II.

■ Insurer argues that the legislative history of the No–Fault Act demonstrates that the General Assembly intended the phrase "nonprivate passenger motor vehicle" to mean all motor vehicles that are not "private passenger motor vehicles" as defined in § 10–4–713(2)(c). We agree.

■ One of the primary uses of legislative history as an aid to statutory construction is to discern the policy objective to be achieved by a statute, so that a court may consider the consequences of a proposed construction and adopt a reading that will achieve consequences consistent with legislative intent. *City of Westminster v. Dogan Construction Co.*, 930 P.2d 585 (Colo.1997). In this regard, we note the observation of Judge Learned Hand, quoted with approval in *City of Westminster:*

> [I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.1945), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

Here, the legislative history of the first enactment of the No–Fault Act in 1973 provides solid guidance as to the policy aims of the General Assembly in enacting § 10–4–713(2). In 1972, the joint committee appointed by the Legislative Council to study automobile insurance laws issued a report containing a draft bill, which was to form the basis for the legislation enacted the following year. *See* Colorado Legislative Council, Research Publ. # 190 *Report to the Colorado General Assembly: Committee on Automobile Insurance*, (1972) (Legislative Council Report).

This early draft bill contained no provisions concerning "private passenger motor vehicles" or "nonprivate passenger motor vehicles" and sharply limited the subrogation rights of insurers. Legislative Council Report, *supra*, at 33–34.

The minority report accompanying the draft criticized this limitation, stating that, if the bill were adopted, "[s]ubstantial shifts in premiums would occur," favoring larger cars, trucks, and buses and penalizing drivers of small cars who suffer greater injuries in accidents with larger vehicles. Legislative Council Report, *supra*, at 14.

At the 1973 legislative session, the No–Fault bill was introduced as H.B. 1073. In an early committee hearing, Representative Carl Gustafson, one of the bill's prime sponsors, introduced an amendment which added subrogation rights for insurers of "private

passenger motor vehicles as against owners, operators, and lessors of "nonprivate passenger motor vehicles." The language of this amendment survived intact in the bill passed into law and was codified at § 10–4–713(2). *See* House Journal, Forty–Ninth General Assembly, First Session at 133–34 (Jan. 26, 1973).

No records of the committee's discussion pertaining to the adoption of this amendment presently exist. However, after the bill passed the House of Representatives, Representative Gustafson testified before a Senate committee to explain the provisions and intent of the bill. He stated:

> We think we put the mechanism in here to prevent ... a premium shift from taking place. We give as a definition, including commercial vehicles, as being covered under this. But then we've provided to the extent that they are the at-fault driver that *if the commercial vehicle hits me that my insurer can claim against the insurer of the commercial vehicle* from dollar one for whatever medical costs they've had to pay on my behalf.

Hearings before Senate Business Affairs and Labor Committee, 49th General Assembly, First Session (Feb. 21, 1973) (emphasis added).

Later, Representative Gustafson specifically pointed out the language he had authored on subrogation rights, stating that this subsection, later codified at § 10–4–713(2), represented:

> the mechanism we've developed to preclude the two or three potential premium-shifting items that are almost inherent in a no-fault bill.... *A commercial vehicle typically being larger, doing more damage, you would tend to equalize rates between commercial and private passengers.* [Subrogation] as against commercial vehicles starts at dollar one.

Hearings before Senate Business Affairs and Labor Committee, 49th General Assembly, First Session (Feb. 28, 1973) (emphasis added).

Taken as a whole, this evidence of the legislative history of the No–Fault Act strongly supports the view that, in enacting § 10–4–713(2), the General Assembly sought to prevent a potential shift in insurance premium costs from the owners and operators of larger commercial vehicles to the owners and operators of smaller trucks and passenger cars.

Representative Gustafson, who was the author of the phrase "nonprivate passenger motor vehicle," indicated before the Senate his view that § 10–4–713(2) was intended to create a dichotomy between what he called "commercial vehicles" and "private passenger" cars for the purposes of subrogation.

As defendants correctly point out, the phrase "commercial vehicles" is not used in the No–Fault Act. However, the legislative history discussed above demonstrates that "nonprivate passenger motor vehicle" was intended to be roughly synonymous with "commercial vehicle" for the purpose of § 10–4–713(2).

We conclude that § 10–4–713(2) must be interpreted in a manner which corresponds to the policy goal of preventing a shift in premiums from large vehicles to small ones and which defines the phrase "nonprivate passenger motor vehicle" to include commercial vehicles as commonly understood.

The only construction of the statute that conforms to the intent, and accomplishes the purpose, of the General Assembly is one by which "nonprivate passenger motor vehicle" denotes all motor vehicles that are not "private passenger motor vehicles" as defined in § 10–4–713(2)(c). That is the reading we adopt here.

### III.

Applying this reading of § 10–4–713(2) to the undisputed facts here, we conclude that a tractor trailer does not meet the criteria set forth in the definition of "private passenger motor vehicle" in § 10–4–713(2)(c).

Further, a tractor trailer is the very type of commercial vehicle the General Assembly sought to bring within the ambit of an insurer's subrogation rights. Thus, because defendants' vehicle is a "nonprivate passenger motor vehicle" under the statute, the trial court erred in entering summary judgment in favor of defendants.

The judgment is reversed, and the cause is remanded for further proceedings in accordance with this opinion.

HUME and BRIGGS, JJ., concur.