**B & B LIVERY, INC., Petitioner,**

v.

**Kathy RIEHL, Respondent.**

**No. 97SC391.**

Supreme Court of Colorado,
En Banc.

June 22, 1998.

White & Steele, P.C., John Lebsack, John P. Craver, Clair Diaz, Denver, for Petitioner.

Davis & Ceriani, P.C., Bruce E. Rohde, John W. Himmelmann, Denver, for Respondent.

Justice SCOTT delivered the Opinion of the Court.

We granted certiorari in *Riehl v. B & B Livery, Inc.*, 944 P.2d 642 (Colo.App.1997), to determine whether a release agreement read in conjunction with a mandatory warning as provided in section 13–21–119, 5 C.R.S. (1997), is ambiguous under the test established in *Heil Valley Ranch v. Simkin*, 784 P.2d 781 (Colo.1989).[1] Respondent Kathy Riehl initiated proceedings in the Arapahoe County District Court (trial court) seeking damages for injuries suffered while riding a horse rented from petitioner B & B Livery, Inc. (B & B). The trial court granted summary judgment to B & B. On appeal, the court of appeals reversed, concluding that the release agreement that respondent Kathy Riehl had signed, which released B & B from liability, was ambiguous. *See B & B Livery*, 944 P.2d at 644. Because we conclude that the release agreement is not ambiguous, we reverse the judgment of the court of appeals.

I.

Kathy Riehl suffered injuries when she was thrown from a horse while participating on a ride organized by B & B. Prior to beginning her horse ride, Riehl executed an exculpatory agreement ("release agreement"), which provided:

> I, understand the potential dangers that I could incur in mounting a horse and in riding on said horse. Understanding those risks I do hereby advise and represent and warrant to B & B Livery, Inc., that I do hereby release that Company, its officers, directors, shareholders, employees and anyone else directly or indirectly connected with that Company from any liability in the event of any injury or damage of any nature (or perhaps even death) to me or anyone else caused by my electing to mount and then ride a horse owned or operated by B & B Livery, Inc.
>
> . . . .
>
> I have executed this release willingly and after having read or been advised of the warning posted by B & B Livery, Inc., which warning states as follows: Under Colorado Law, an equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities pursuant to section 13–21–119 Colorado Revised Statutes.

Riehl filed a complaint in the Arapahoe County District Court, alleging that: (1) B & B failed to determine or account for her riding ability level; (2) B & B supplied Riehl with faulty gear or equipment for the ride; (3) B & B's conduct was willful and wanton or grossly negligent. B & B successfully moved for summary judgment on the ground that Riehl's claims were precluded by the release agreement, and Riehl appealed.

The court of appeals reversed and remanded, reasoning that the trial court erred in granting summary judgment based on its conclusion that Riehl had voluntarily signed a release agreement that released B & B from

---

1. Our order granting certiorari required briefing and argument as to the following question: Whether the court of appeals erred in finding the release agreement ambiguous by reading the re- lease agreement together with required statutory language.

liability for any injury Riehl might incur from riding a horse supplied by B & B. The court of appeals held that under *Jones v. Dressel,* 623 P.2d 370 (Colo.1981), the release agreement—the language of the agreement taken in conjunction with the incorporated statutory terms—was ambiguous.[2]

Section 13–21–119, 5 C.R.S. (1997), as further explained below, provides that an equine professional is not liable for an injury or death of a participant resulting from the inherent risks of equine activities. The release agreement provided, however, that B & B would not be liable for any injury or death. The court of appeals explained, therefore, that there was an ambiguity as to whether the release agreement:

> was intended to exculpate defendant from liability for all negligent acts, including acts contrary to § 13–21–119, and not foreseeable, or, rather, whether exculpation was intended to extend only to those acts that result in injuries arising from the inherent risks of equine activities that are reasonably foreseeable and consistent with the public policy of the state as expressed in the statute.

*B & B Livery,* 944 P.2d at 644.

Chief Judge Sternberg dissented, finding no ambiguity in the release agreement. In his dissenting opinion, Judge Sternberg relied upon *Heil Valley Ranch v. Simkin,* 784 P.2d 781 (Colo.1989). In *Heil Valley Ranch,* we held that "the inquiry should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Id.* at 781. The dissent concluded that *Heil Valley Ranch* controlled and required a contrary result because in the present case, the parties simply intended that B & B be absolved of liability for a broad range of conduct.

## II.

### A.

■ Generally, exculpatory agreements have long been disfavored. *See, Heil Valley*

*Ranch,* 784 P.2d at 783. "They stand at the crossroads of two competing principles: freedom of contract and responsibility for damages caused by one's own negligent acts." *Id.* at 784. Exculpatory agreements are not necessarily void, however, as long as one party is not "at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence." *Id.* (quoting W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 482, (5th ed.1984)). The determination of the sufficiency and validity of an exculpatory agreement is a question of law for the court to determine. *See Jones,* 623 P.2d at 375. In determining whether an exculpatory agreement is valid, there are four factors which a court must consider: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language. *See id.* In this case, the parties agree that only the fourth factor is at issue.

■ Interpretation of a written contract is a question of law for the court. *See Colard v. American Family Mut. Ins. Co.,* 709 P.2d 11 (Colo.App.1985). Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation. See *Browder v. U.S. Fidelity & Guar. Co.,* 893 P.2d 132, 133 (Colo.1995); *see also* 2A N. Singer, Sutherland Statutory Construction § 45.02 (5th ed.1992) (ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses). If there is no ambiguity, a contract will be enforced according to the express provision of the agreement. *See GTM Invs. v. Depot, Inc.,* 694 P.2d 379 (Colo.App.1984).

Because this case involves equine activities, the following overview of the statute governing equine activities is instructive. In 1989, section 13–21–119, 5 C.R.S. (1997), "Equine activities—llama activities—legisla-

---

**2.** The court of appeals also reversed the trial court's summary judgment because it found that the release agreement did not preclude Riehl's

claims based upon wanton and willful conduct or gross negligence.

tive declaration—exemption from civil liability," was enacted by the General Assembly. The statute stated as its purpose that:

> The general assembly recognizes that persons who participate in equine activities or llama activities may incur injuries as a result of the risks involved in such activities. The general assembly also finds that the state and its citizens derive numerous economic and personal benefits from such activities. *It is, therefore, the intent of the general assembly to encourage equine activities and llama activities by limiting the civil liability of those involved in such activities.*

(Emphasis added.)

Section 13–21–119(3) provides that "an equine professional ... shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities ... except as provided in subsection (4) ...."[3] "Inherent risk" in relevant part means "those dangers or conditions which are an integral part of equine activities [such as] ... (I) The propensity of the animal to behave in ways that may result in injury, harm or death to persons on or around them." Section 13–21–119(4) essentially provides, among other things, that:

> [n]othing in subsection (3) of this section shall prevent or limit the liability of ... an equine professional ... if the ... equine professional ...:
>
> (I)(A) Provided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and such equipment or tack was faulty to the extent that it did cause the injury; or
>
> (B) Provided the animal and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity ... and determine the ability of the participant to safely manage the particular animal based on the participant's representations of his [or her] ability;
>
> . . . .

(III) Commits an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury.[4]

Finally, section 13–21–119(5) mandates every written contract entered into by an equine professional "for the providing of professional services, instruction, or the rental of equipment or tack or an equine to a participant," must contain the following warning notice:

### WARNING

Under Colorado Law, *an equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities,* pursuant to section 13–21–119, Colorado Revised Statutes.

(Emphasis added.) Accordingly, section 13–21–119 provides that every release agreement between an equine professional and a participant include the warning that the equine professional is not liable for "inherent risks" resulting from an equine activity.

The placement of the statutorily mandated warning in the agreement, however, does not limit an equine professional's liability for negligent acts committed by an equine professional that results in injury or harm to the participant, as explained above. Such a result can only be achieved by the use of additional language. By adding the additional language, however, an equine professional's form agreement should not be deemed ambiguous simply because it might have been drafted with greater care.

### B.

■ This case involves the interpretation of a release agreement containing this mandatory section 13–21–119 warning in conjunction with a broader clause limiting liability "in the event of any injury or damage of any nature (or perhaps even death)." Apparent-

---

**3.** In this case, B & B qualifies as an "equine professional." Section 13–21–119(2)(e) defines an "equine professional" as a person engaged for compensation: "(I) In instructing a participant or renting to a participant an equine for the purpose of riding, driving, or being a passenger upon the equine; or (II) In renting equipment or tack to a participant." Section 13–21–119(2)(b) defines "Equine" as "a horse, pony, mule, donkey, or hinny."

**4.** These subsections in block quote are, in effect, Riehl's claims in her complaint.

ly, B & B inserted the broader clause limiting liability in its release agreement because it realized that the mandatory section 13–21–119 warning did not limit its liability if it were negligent in committing certain prescribed acts, and/or from harm or injury to the participant resulting from "non-inherent" or other risks.

The question presented here, therefore, is whether the release agreement is ambiguous because it contains the mandatory section 13–21–119 warning as well as a broader clause limiting liability from non-inherent risks. Because every equine release agreement limiting liability must contain the mandatory warning, we hold that, under the facts of this case, the insertion of a broader clause further limiting liability does not make the agreement ambiguous per se. *Cf. Allstate Ins. Co. v. Schneider Nat'l Carriers, Inc.*, 942 P.2d 1352, 1355 (Colo.App.1997) (language is "ambiguous" when it is reasonably capable of being understood in more than one sense). The broader clause merely evinces an intent to extinguish liability above and beyond that provided in section 13–21–119. As we stated in *Heil Valley Ranch*, 784 P.2d at 785, "[t]he inquiry should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." Here, that intent was clearly and unambiguously expressed not by the standard section 13–21–119 warning but as a consequence of the additional clause limiting liability "in the event of any injury or damage of any nature (or perhaps even death)."

Furthermore, the release agreement here was written in simple and clear terms, it was not inordinately long and complicated, and Riehl indicated in her deposition that she understood that by executing the agreement, she was in fact granting B & B a release.[5] *Cf. Brooks v. Timberline Tours, Inc.*, 941 F.Supp. 959, 962 (D.Colo.1996) (release provisions written in simple, clear terms, and were not inordinately long or complicated and ex-

cluded specifically "any and all liability, claims, demands, actions, or rights of action, which are related to or are in any way connected with [plaintiffs'] participation in this activity [snowboarding]"); *Potter v. National Handicapped Sports*, 849 F.Supp. 1407, 1410–11 (D.Colo.1994) (holding that liability waiver clearly and unambiguously established parties' intent to extinguish sponsor's liability for injuries to skier arising from sponsor's negligent acts where waiver was, among other things, written in simple and clear terms, not inordinately complicated, plaintiff indicated that there were no terms that he did not understand, and indicated that the waiver addressed the risk that described the circumstances of plaintiff's injury); *Heil Valley Ranch*, 784 P.2d at 785 (finding release agreement unambiguous, noting, among other things, that: (1) the agreement was written in simple and clear terms that were free from legal jargon; (2) it was not inordinately long and complicated; (3) the plaintiff indicated in her deposition that she understood the release; (4) the first sentence of the release specifically addressed a risk that described the circumstances of the plaintiff's injury).

Therefore, while we cannot be certain that if Riehl had read and studied the agreement she would have signed it, there can be no dispute she intended to grant a general release to B & B. Based on the release she did sign, which was clear and consistent with the intent of the parties, we find no basis in our law or the facts present here that requires us to save Riehl from her voluntary, knowing, and intentional act releasing B & B from liability for her injuries.

### III.

Accordingly, because we conclude that the release agreement is not ambiguous, we reverse the judgment of the court of appeals

---

5. In her deposition, Riehl stated that "[she] really didn't read" the release agreement before she signed the document. Riehl, however, admitted that she was aware that what she was signing was a release. Additionally, Riehl admitted that she had signed releases in the past and that she was familiar with the fact that some activities required releases. Furthermore, in the absence

of fraud, one who signs a contract without reading it is barred from claiming she is not bound by what she has signed. *See Rasmussen v. Freehling*, 159 Colo. 414, 412 P.2d 217 (1966); *see also Cordillera Corp. v. Heard*, 41 Colo.App. 537, 592 P.2d 12 (1978) (party signing an agreement is presumed to know its contents), *aff'd*, 200 Colo. 72, 612 P.2d 92 (1980).

and remand this matter to that court with directions that it return the case to the trial court for further proceedings on Riehl's willful and wanton/gross negligence claims.

HOBBS, J., dissents, and MULLARKEY and MARTINEZ, JJ., join in the dissent.

Justice HOBBS dissenting:

I respectfully dissent. B & B's form of release did not unambiguously notify Riehl that she was waiving any and all rights of action against the business in the event it breached its duty to her of exercising reasonable care.

Agreements that attempt to insulate a party from liability from his or her own negligence have long been disfavored, *see Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 783 (Colo.1989), and must be closely scrutinized. *See Jones v. Dressel*, 623 P.2d 370, 376 (Colo.1981). B & B's release referred in clear terms to the inherent risks of equine activity but not to the risk that this business might fail to adhere to the usual and customary safety procedures of the industry, such as (1) selecting a horse suitable to the rider's level of experience and skill, (2) utilizing equipment and tack in good condition, (3) cinching and fitting the saddle, stirrups, and bridle correctly, and (4) giving appropriate passenger safety instructions for handling the horse and one's self.

Section 13–21–119(5), 5 C.R.S. (1997), requires equine professionals to provide warnings to prospective riders that they undertake, without recourse, the inherent risks of equine activity. Under section 13–21–119(2)(f), 5 C.R.S. (1997), these risks include, but are not limited to, the horse's reaction to sound, sudden movement, and unfamiliar objects, persons, or other animals; surface and subsurface terrain hazards; and collisions with other animals or objects. On the other hand, the equine professional is responsible under section 13–21–119(4)(b), 5 C.R.S. (1997), for providing the rider with proper equipment and tack, and for selecting a horse which is suitable to the rider's ability. The equine professional may not expose the rider to dangerous latent conditions without warning, and may not commit acts or omissions that constitute a willful or wanton disregard for the safety of the participant. *Id.* The provider may rely on the participant's representation of his or her ability. *Id.*

Falling from a horse in Colorado's challenging terrain can cause serious injury or death. Though riders can be expected to absorb the inherent risks of this potentially dangerous activity, they cannot reasonably expect, in the absence of notice and informed consent, to fall victim to the equine professional's negligence. We must therefore closely scrutinize the release language used by B & B to ascertain, as a matter of law, whether Riehl's waiver of rights constituted informed consent under the circumstances and can be given effect.

B & B seeks to immunize itself from its liability for breach of its statutory duty and its common law duty to exercise reasonable care under the circumstances. In this regard, it relies on our decision in *Heil Valley*, 784 P.2d at 781. There we set forth four factors for determining whether an exculpatory release is valid:

(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language.

*Id.* at 784 (quoting *Jones*, 623 P.2d at 376). At issue here is the fourth factor, and under *Heil Valley* we must determine "whether the intent of the parties was to extinguish liability [for negligence] and whether this intent was clearly and unambiguously expressed." *Heil Valley*, 784 P.2d at 785.

An agreement is ambiguous when it is fairly susceptible to more than one reasonable interpretation. *See Browder v. United States Fidelity & Guar. Co.*, 893 P.2d 132, 133 (Colo.1995). If two or more interpretations can reasonably result from a reading of B & B's language, the reading most favorable to Riehl must be chosen because exculpatory agreements are strictly construed against the drafter. *See Heil Valley*, 784 P.2d at 784.

The majority opinion sets forth the operable language of the release. Maj. op. at 135. The opening sentence of the release states

that the participant understands "the potential dangers that [the rider] could incur in mounting a horse and in riding said horse." The next sentence again refers to the "potential dangers" of horseback riding, stating that "[u]nderstanding those risks," the reader agrees to waive liability for "any injury or damage of any nature" arising from the activity. These references to the potential dangers of horseback riding could reasonably be read as relating to the inherent risks of equine activity that must be waived by statute.

The majority holds that the second sentence, waiving liability for "any injury or damage of any nature," operates as a comprehensive waiver of liability for injuries arising from the rental of a horse from B & B, including injuries arising from B & B's negligence. Maj. op. at 135. However, nowhere does the form refer to releasing B & B from its own negligence, and the release recites that the signer has executed the agreement "willingly and after having read or been advised of" the warning required to be given under section 13–21–119. This language carries that logical inference that, in signing the form, the participant acknowledges that she has been informed of the statutory limitation regarding the inherent risks of equine activity and is waiving liability for injuries arising only from those risks.

Because B & B's agreement can logically be read in a manner that differs from the majority's reading, it cannot be said that "the intention of the parties is expressed in clear and unambiguous language." *Heil Valley*, 784 P.2d at 784. The agreement must therefore be strictly construed against its drafter, B & B, so as not to immunize B & B from its own negligence.

In *Heil Valley*, we held that an exculpatory agreement "purporting to waive 'any claim [plaintiff] might state against the [defendant] as a result of physical injury incurred' while horseback riding" covered claims based on negligence. *Id.* at 781. In enforcing the agreement, we noted that it was written in simple and clear terms that were free from legal jargon, and was not complicated. *Id.* at 785. The plaintiff had acknowledged that she understood the agreement. *Id.* The agreement's first sentence specifically addressed the circumstances of the plaintiff's injury. *Id.* The rider was experienced and knew of the equine professional's safety duties, yet waived them. As an experienced rider, she could have foreseen the risk that the horse might rear, causing the resultant injury. *Id.*

By contrast, the ambiguity in B & B's release illustrates that it was not simple, clear, and uncomplicated. While the plaintiff in *Heil Valley* stated that she understood the agreement, Riehl stated here that she relied on the operative phrase in the release, "inherent risk." None of Riehl's claims based upon negligence or gross negligence are among the inherent risks of equine activity set forth in section 13–21–119. The agreement in this case makes no reference to the risk that an operator might commit acts of negligence by providing faulty equipment or a horse that was unsuited to the rider's abilities. Therefore the release did not address a risk that described the circumstances of the plaintiff's injury. Finally, in contrast to the rider in *Heil Valley*, Riehl was a novice rider. She had ridden a horse only once before—on a beginner's trail.[6]

A novice like Riehl who is presented with a pre-printed form, is eager to commence the ride, and is relying on the good faith of the person to whom she has paid the price of service, should expect that a business like B & B is not departing from customary safety practices of the industry. She, and other visitors and residents of Colorado like her, should not be required to scrutinize such an instrument for its intent before mounting the horse.

---

6. The majority cites two federal district court cases, applying Colorado law, that granted summary judgment motions in negligence actions based on exculpatory agreements that the court found to be unambiguous. Maj. op. at 136. In each of those cases, however, one of the releases signed by the plaintiffs *explicitly* waived claims for actions based upon negligence. *See Potter v. National Handicapped Sports*, 849 F.Supp. 1407, 1410–11 (D.Colo.1994); *Brooks v. Timberline Tours, Inc.*, 941 F.Supp. 959, 960–61 (D.Colo. 1996).

Accordingly, I would uphold the judgment of the court of appeals.

MULLARKEY and MARTINEZ, JJ., join in this dissent.

