**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**December 12, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RSACO, LLC, a Delaware limited
liability company,

       Plaintiff-Appellant/Cross-Appellee,

v.

RESOURCE SUPPORT ASSOCIATES,
INC., d/b/a RSA COMPANIES, INC., a
Colorado corporation; RSA MID-
RANGE, LLC, a Colorado limited
liability company; and ROBERT N.
FUGLEI, a Colorado resident,

       Defendants-Appellees/Cross-
       Appellants.

_____

RESOURCE SUPPORT ASSOCIATES,
INC. d/b/a RSA COMPANIES, INC., a
Colorado corporation; and RSA MID-
RANGE, LLC, a Colorado limited
liability company,

       Third Party Plaintiffs-
       Appellees/Cross-Appellants,

v.

BENTLEY FORBES GROUP, LLC, a
Delaware limited liability company, and
BFG HOLDINGS 2000, LLC, a Delaware
limited liability company,

       Third Party Defendants-Appellants/
       Cross-Appellees.

No. 05-1158 & 05-1160

(D.C. No. 01-MK-1401)
(D. Colorado)

## ORDER AND JUDGMENT[*]

Before **BRISCOE, HOLLOWAY,** and **LUCERO**, Circuit Judges.

This is a diversity action which was tried to a jury. The issues raised on appeal concern the district court's post-trial rulings on motions for judgment as a matter of law. Plaintiff RSACO, LLC, appeals from the district court's denial of its motion for judgment as a matter of law on its claim for breach of a lease agreement against defendant Resource Support Associates, Inc. Defendant RSA Mid-Range, LLC, cross-appeals from the district court's denial of its motion for judgment on its counterclaim for breach of an option agreement against RSACO, LLC. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

***Factual background***

Resource Support Associates, Inc. (RSA) is a Colorado-based computer consulting services company owned and managed by Robert Fuglei. In late 1997 or early 1998, Fuglei purchased a piece of land in Englewood, Colorado. Fuglei transferred ownership of the land to RSA Mid-Range, LLC (Mid-Range), a company created by RSA to handle

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 (eff. Dec. 1, 2006) and 10th Cir. R. 32.1 (eff. January 1, 2007.)

RSA's real estate transactions. Shortly thereafter, RSA hired a contractor to construct an office building on the land for RSA's use. RSA moved into the completed office building in late 1999 or early 2000.

Shortly after moving into the building, RSA experienced a substantial downturn in its revenues. Accordingly, RSA decided to sell the building and obtain as much cash as it could out of the sale. RSA hired a real estate broker and placed the building on the market.

Although RSA received several offers on the property, it ultimately settled on an offer from Bentley Forbes Group, LLC (Bentley Forbes), a real estate acquisition company founded in Delaware but headquartered in California. Bentley Forbes generally negotiates real estate transactions, typically through sale-leaseback provisions, and then transfers its rights to special purpose entities it forms specifically to own and possess the real estate.

On January 24, 2001, Mid-Range and Bentley Forbes entered into a sale and purchase agreement for the building. On that same date, Mid-Range and Bentley Forbes entered into an advisory fee agreement pursuant to which Mid-Range agreed to pay $950,000 to Bentley if the sale occurred. No services were provided by Bentley Forbes to Mid-Range in exchange for this payment. Instead, the advisory fee agreement essentially amounted to a price concession on the part of Mid-Range.

On April 6, 2001, Bentley Forbes created RSACO, LLC (RSACO) to hold title to the property and enter into a leaseback agreement with RSA. In turn, Bentley Forbes

utilized a holding company it had previously created, BFG Holdings 2000, LLC (BFG), to hold RSACO (BFG also held all of the other single-purpose landlord entities created by Bentley Forbes). Notably, Bentley Forbes, RSACO, and BFG were operated by the same core group of individuals: Frederick Wehba, Sr. (the co-founder of Bentley Forbes), Carl Wehba (Frederick Wehba's son, who also co-founded Bentley Forbes and managed RSACO), Chad Wehba (Frederick Wehba's son, who worked for Bentley Forbes and helped manage RSACO), Christopher Cates (Frederick Wehba's nephew, who worked for Bentley Forbes), and Christian Wehba (Frederick Wehba's son, who worked for Bentley Forbes). It is undisputed that Fred Wehba, Sr., generally made the key decisions with respect to all of these entities.

On April 24, 2001, the parties formally closed the deal. Along with the sale and purchase agreement for the property, the parties entered into four related agreements: (1) BFG executed a $2,350,000 promissory note payable to RSA in monthly installments of $19,876.29; (2) RSA entered into a lease agreement with RSACO, under which RSA agreed to lease the property for a period of twenty years for $1,190,000 per year (or $99,166.67 monthly), and to pay all expenses associated with the property; (3) Bentley Forbes loaned Mid-Range $250,964.34[1], which was to be disbursed to Mid-Range in twelve monthly payments of approximately $25,000 each, and was to be repaid by Mid-Range in part by cash and in part by RSA's provision of $100,000 worth of computer

_____

[1] The purpose of this loan was to provide RSA with additional cash during the first year of the leaseback agreement.

consulting services to Bentley Forbes (in order to create custom software to automate Bentley Forbes' core functions); and (4) Mid-Range and RSACO entered into an option agreement, pursuant to which Mid-Range retained the right to exercise an option and own 1.6 acres of the parcel for a nominal sum.[2]

In early May 2001, RSA made its first lease payment to RSACO. Shortly thereafter, Fred Wehba, Sr., called Fuglei, the CEO of RSA, and complained about the computer consulting services that RSA was providing to Bentley Forbes in connection with the $250,964.34 loan agreement between Bentley Forbes and Mid-Range. In response, Fuglei and Mary Cooley, the RSA employee who was responsible for overseeing RSA's provision of computer consulting services to Bentley Forbes, flew to California and met with Wehba Sr., in his office on or about May 7, 2001. Wehba Sr., in a belligerent and profane manner, vented at Fuglei and Cooley, complaining that Bentley Forbes could have achieved the goal of automating its functions by purchasing off-the-shelf software, rather than paying RSA for custom-designed software.

Following the meeting, Wehba Sr. left a voice-mail message for Fuglei apologizing for his behavior and saying that what he really wanted was for RSA to "put together a summary of what the additional time and costs would be in order to complete the project." Tr. at 576. Based upon this message, Fuglei instructed Cooley to compile such a summary, which Cooley did. Although RSA sent this summary to Wehba Sr., he

---

[2] The parties had originally intended that Mid-Range would retain, and not sell, this 1.6 acre parcel to RSACO. However, Mid-Range was unable to obtain a subplat prior to closing and, accordingly, the parties entered into the option agreement.

never responded to it. Instead, on May 21, 2001, Bentley Forbes sent a letter to RSA asserting that RSA and Mid-Range had defaulted on their obligations under the $250,964.34 loan agreement by failing to adequately provide the computer consulting services allegedly called for under the loan agreement.

On June 1, 2001, RSA paid its June rental payment to RSACO under the lease agreement. However, BFG did not make its June payment to RSA under the $2,350,000 promissory note (or any subsequent payments thereunder), nor did Bentley Forbes make its June disbursement to Mid-Range under the $250,964.34 loan agreement (or any subsequent disbursements thereunder). The effect on RSA was, according to Fuglei, "catastrophic." Tr. at 580. Because of RSA's net operating loss during 2001, its cash flow was minimal or non-existent. Thus, the lack of the note payment from BFG and the disbursement from Bentley Forbes rendered RSA unable to make the July payment due under the lease agreement with RSACO.

Following RSA's failure to pay its July rent, Bentley Forbes contacted the building subtenants and directed them to pay their rent directly to Bentley Forbes. According to Fuglei, this "took away all of any kind of ability" for RSA to make any subsequent rental payments to RSACO. Id. at 582. On September 6, 2001, RSACO demanded that RSA either pay the past due rent or vacate the property. On November 9, 2001, RSA vacated the property. At that time, RSA's main lender, Citywide Bank, had recorded a $500,000 deed of trust on the property, and several contractors (who had performed work on the inside of the building to prepare it for other subtenants) had filed mechanics liens against

the property. The 1.6 acre parcel that was the subject of the option agreement was never transferred to Mid-Range.

### *Procedural background*

On July 20, 2001, RSACO filed this diversity action against RSA, Mid-Range, and Fuglei asserting various claims, including a claim against RSA for breach of the lease agreement. Mid-Range asserted various counterclaims against RSACO and third-party claims against Bentley Forbes and BFG, including one for breach of the option agreement. These claims proceeded to trial in July 2004. At the conclusion of all the evidence, the jury found, with respect to RSACO's breach of lease claim, that RSA "failed to perform its obligations under the lease agreement" and that RSACO "was damaged" as a result thereof. App. at 304. However, the jury also found that RSA proved by a preponderance of the evidence "that its performance under the lease was excused because it was prevented from performing under the lease." Id. at 305. Accordingly, judgment was entered in favor of RSA on the breach of lease claim. Id. As for Mid-Range's claim for breach of the option agreement, the jury found, in pertinent part, that Mid-Range had failed to perform its obligations under the option agreement. Id. at 310. Accordingly, judgment was entered in favor of RSACO and BFG on that claim. Id.

II.

*RSACO's Appeal - No. 05-1158*

At the close of all the evidence, RSACO moved for judgment as a matter of law on its claim for breach of the lease agreement, arguing that what the parties refer to as "hell or high water" provisions in the lease agreement precluded RSA's affirmative defense of prevention of performance. The district court denied RSACO's motion, concluding that the prevention of performance defense was viable and should be submitted to the jury. In its appeal, RSACO contends the district court's ruling was erroneous because: (1) under Colorado law, the hell or high water provisions should have been construed as precluding the defense of prevention of performance; and (2) in any event, the evidence presented at trial was insufficient to establish the prevention defense.

We review the district court's ruling de novo, applying the same standard as the district court. Smith v. Aztec Well Servicing Co., 462 F.3d 1274, 1287 (10th Cir. 2006). Judgment as a matter of law "is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." McInnis v. Fairfield Communities, Inc., 458 F.3d 1129, 1136 (10th Cir. 2006). "We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for those of the jury." Id. "However, we must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law." Id. "We must view the evidence and any inferences to be drawn therefrom most favorably to the non-moving party." Id.

*Should the hell or high water provisions have been interpreted as precluding the defense of prevention of performance?*

RSACO contends that the hell or high water provisions contained in the lease agreement were intended by the parties, and should have been treated by the district court, as precluding all defenses on the part of RSA, including the defense of prevention of performance. Because this is a diversity case, the substantive law of the forum state, i.e., Colorado, governs the analysis of RSA's arguments. Haberman v. The Hartford Ins. Group, 443 F.3d 1257, 1264 (10th Cir. 2006).

The interpretation of a contract under Colorado law is a legal question. Grant v. Pharmacia & Upjohn Co., 314 F.3d 488, 491 (10th Cir. 2002); Fibreglas Fabricators, Inc. v. Kylberg, 799 P.2d 371, 374 (Colo. 1990). Whether a contractual term is ambiguous is also a question of law. Fibreglas, 799 P.2d at 374. If a contract is ambiguous, external evidence may be considered to determine the contract's meaning, and the interpretation of the contract becomes a question of fact. Stegall v. Little Johnson Assocs., Ltd., 996 F.2d 1043, 1048 (10th Cir. 1993).

Here, the question is whether the following provisions contained in the lease agreement, which the parties generally refer to as the hell or high water provisions, precluded RSA from asserting the defense of prevention of performance:

**3.1  Basic Rent.**  * * *  Tenant unconditionally and irrevocably agrees to pay the Basic Rent . . . .

* * *

-9-

**3.5  Net Lease; No Termination.**

    3.5.1  This is an absolutely net lease to Landlord.  It is the intent of Landlord and Tenant that the Basic Rent payable under this Lease shall be an absolutely net return to Landlord and that Tenant shall pay all costs and expenses of every kind and nature provided in this Lease.  Any amount or obligation herein relating to the Property, which is not expressly declared to be that of Landlord shall be deemed to be an obligation of Tenant to be performed by Tenant at Tenant's expense.  Basic Rent, Additional Rent and all other sums payable hereunder by Tenant, shall be paid without notice . . . , demand, set-off, counterclaim, abatement, suspension, deduction or defense.

    3.5.2  This lease shall not terminate nor shall Tenant have any right to terminate this Lease (except as otherwise expressly provided in Article 7), nor shall Tenant be entitled to any abatement or reduction of rent under this Lease (except as expressly provided in Article 7 of this Lease), nor shall the obligations of Tenant under this Lease be affected by reason of: (i) any damage to or destruction of all or any part of the Property from whatever cause; (ii) the taking in whole or in part of the Property or any portion thereof by condemnation, requisition or otherwise except as provided in Article 7; (iii) the prohibition, limitation or restriction of Tenant's use of all or any part of the Property, or any interference with such use; (iv) Tenant's acquisition or ownership of all or any of the Property otherwise than as expressly provided herein; (v) any default on the part of Landlord under this Lease, or under any other agreement to which Landlord and Tenant may be parties; (vi) any abandonment of the Property by Tenant; or (vii) any other cause whether similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding.  It is the intention of Landlord and Tenant that the obligations of Tenant under this Lease shall be separate and independent covenants and agreements, that the Basic Rent, the Additional Rent and all other sums payable by Tenant under this Lease shall continue to be payable in all events and that the obligations of Tenant under this Lease shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to Article 7 of this Lease.

    * * *

3.5.4 Tenant waives all rights which may now or hereafter be conferred by law (i) to voluntarily quit, terminate or surrender this Lease or the Property or any part thereof, or (ii) to any abatement, suspension, deferment or reduction of the Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise provided in Article 7 of this Lease.

App. at 535-37.

To be sure, the above-quoted clauses are broadly written. In particular, clause 3.5.2 precludes RSA from relying on most available reasons for not fulfilling its obligations under the lease (e.g., destruction of the building). However, it is also clear that "prevention of performance" by RSACO or its related entities is not one of the specifically listed defenses that is precluded by clause 3.5.2. Thus, RSACO is left to rely on clause 3.5.2's "catch-all" language (as well as the more general language of the other clauses), which, as noted, states: "any other cause whether similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding." Although RSACO argues that this language, on its face, clearly prohibits RSA's reliance on the prevention of performance defense, we disagree. In our view, the "catch-all" clause is, at best, ambiguous when applied to the defense of prevention of performance.[3] Thus, we have looked beyond the lease agreement to determine if there is additional evidence in the record indicating whether the parties intended for the "catch-all" clause to apply to the

_____

[3] As noted by RSA, "the clause makes no reference to tortious conduct and therefore cannot reasonably be read as waiving a defense sounding in tort." Aplee. Br. at 19.

-11-

defense of prevention of performance. No such evidence exists in the record.[4] Thus, under Colorado law, the "catch-all" clause must be strictly construed against its drafter, RSACO. E.g., B & B Livery, Inc. v. Riehl, 960 P.2d 134, 140 (Colo. 1998). In turn, we conclude the district court did not err in holding that the defense of prevention of performance remained viable, notwithstanding the hell or high water provisions cited by RSACO. See generally 9 A. Corbin, Contracts § 947, p.721-22 (2002) (noting that where the parties to a contract do not "say nor think anything about" prevention of performance, it is proper to treat the contract as containing an implied promise not to prevent or hinder performance).

Even assuming, for purposes of argument, that the "catch-all" clause unambiguously applies to the defense of prevention of performance, we are persuaded that the clause would be unenforceable under Colorado law. As noted by the district court, Colorado has "a strong public policy in favor of protecting tort victims . . . ." Friedland v. Travelers Indem. Co., 105 P.3d 639, 646 (Colo. 2005). Similarly, Colorado "[p]ublic policy prohibits indemnifying a party for damages resulting from intentional or willful wrongful acts." Equitex, Inc. v. Ungar, 60 P.3d 746, 750 (Colo. App. 2002) (internal quotation marks omitted). And, the Colorado courts "will not enforce a contract that violates public policy even if the failure to do so is 'unfair' to one of the parties . . . ."

---

[4] Indeed, we are persuaded, based upon our review of the trial transcript, that RSA would not have entered into the lease agreement had it known the lease provisions were intended to be binding even in the event of wrongful conduct on the part of RSACO or its related entities.

Id.  Considering all of these principles together, we conclude that the Colorado courts would not enforce the hell or high water provisions of the lease to the extent that they sought to protect RSACO or its related entities from engaging in the wrongful act of preventing RSA from fulfilling its obligations under the contract.  See generally 9 Corbin, supra § 947 at 721 (noting that "prevention or hindrance is a breach of contract in any case in where the facts justify the implication of a promise."); id. at 722 ("Generally, . . . the parties . . . neither say nor think anything about it; and prevention or hindrance should clearly be regarded as wrongful."); id. ("In some cases the wrongful conduct could have been treated as a tort; and it can still be so treated if the courts find it of advantage in the course of justice.").

Finally, we reject RSACO's contention that the district court's decision conflicts with our decision in Colorado Interstate Corp. v. CIT Group/Equipment Financing, Inc., 993 F.2d 743 (10th Cir. 1993).  To be sure, the lease agreement at issue in Colorado Interstate (for computer equipment) contained some language that was similar to that contained in the lease at issue here.[5]  Importantly, however, there was no allegation of prevention or hindrance of performance.  Thus, we were not asked to determine whether the hell or high water language at issue in that case encompassed such a defense.

_____

[5] Like the lease agreement at issue here, the lease agreement at issue in Colorado Interstate provided: "the rights of Lessor and Assignee in and to such Rent, are absolute and unconditional and are not subject to any abatement, reduction, setoff, defense, counterclaim or recoupment due or alleged to be due to, or by reason of, any past, present or future claims, which Lessee may have against Lessor, Assignee, the manufacturer or seller of the equipment, or against any person for any reason whatsoever."  993 F.2d at 747.

-13-

Moreover, we noted, in dicta, that there was no allegation of "fraud or deceit," thereby suggesting that wrongful conduct would be sufficient to undermine the effect of the hell or high water provision. 993 F.2d at 749. In sum, then, <u>Colorado Interstate</u> was not controlling, and did not preclude the district court from ruling that the lease provisions at issue here did not preclude RSA from asserting the defense of prevention of performance.[6]

*Was RSA's evidence in support of its prevention defense insufficient as a matter of law?*

RSACO argues that, even assuming the district court did not err in allowing RSA's defense of prevention to go to the jury, RSA failed, as a matter of law, to present sufficient evidence to support that defense. In this regard, RSACO argues that: (1) RSA failed to prove that Bentley Forbes or BFG were agents of RSACO; (2) all of the conduct on which RSA based its prevention defense was contractually authorized (e.g., collection of rent from RSA's subtenants; Bentley Forbes' decision to declare RSA in default under the loan agreement; BFG's decision to cease payments under the promissory note); and (3) RSA failed to prove that RSACO, Bentley Forbes, or BFG actually prevented or substantially interfered with RSA's ability to pay rent (because RSA had ample funds in escrow to meet its rent obligations).

RSACO is mistaken on all of these points. Turning first to RSACO's agency arguments, it is beyond dispute that each of the agreements entered into by the parties on

_____

[6] It is also worth noting that the contract at issue in <u>Colorado Interstate</u> was governed by Texas law, not Colorado law.

-14-

April 24, 2001, were necessary not only to the transfer of ownership of the property from Mid-Range to RSACO, but also to the ultimate success of the lease agreement between RSACO and RSA. Thus, as noted by the district court, RSACO was, at a minimum, the third-party beneficiary of the non-lease agreements. See Jefferson County School Dist. No. R-1 v. Shorey, 826 P.2d 830, 843 (Colo. 1992) (discussing third-party beneficiary doctrine). In addition, the uncontroverted evidence presented at trial indicated that all of the Bentley Forbes-related entities were owned and operated by the same, limited number of family members, that all of the important decisions with respect to each of the Bentley-Forbes-related entities were made by Frederick Wehba, Sr., the co-founder of Bentley-Forbes, and that corporate formalities were largely ignored in the day-to-day operations of those entities. In other words, each of the Bentley-Forbes-related entities could reasonably be said to be instrumentalities or agents of not only Bentley Forbes, but each other as well. See generally Dworkin, Chambers & Williams, P.C. v. Provo, 81 P.3d 1053, 1058 (Colo. 2003) (discussing definition of agent). Given these circumstances, we are not persuaded that the district court erred in concluding that the equitable doctrine of prevention was a viable defense to RSACO's claim against RSA for breach of the lease agreement. To conclude otherwise would elevate form over substance and allow RSACO to accomplish through its related entities what the doctrine of prevention was clearly intended to prohibit.

As for RSACO's arguments that all of the actions of its related entities were contractually authorized, this misses the key point that it was not RSA that triggered the

-15-

chain of events that led to the default, but rather Fred Wehba, Sr.'s decision to declare

RSA in default on the computer consulting contract. According to the record on appeal,

Wehba Sr. had little or no computer experience, and unreasonably believed that RSA

would be able to fully automate all of Bentley Forbes' corporate functions for a total price

of $100,000. Further, the record indicates that, although Wehba Sr. voiced his concerns

to RSA, he made no true effort to resolve those concerns (e.g., by discussing with RSA

how much total time and expense they estimated it would take to complete the project, or

to discuss with RSA the possibility of a price concession). In sum, it was Wehba Sr.'s

unfounded decision to declare RSA and Mid-Range in default on their obligations under

the $250,964.34 loan agreement that initiated the chain of events that rendered RSA

unable to make its monthly lease payments.[7]

Finally, contrary to RSACO's assertions, the evidence presented at trial was

sufficient to allow a reasonable jury to find that RSACO and its related entities actually

prevented or substantially interfered with RSA's ability to pay rent. To be sure, RSACO

presented at trial the deposition testimony of Don Jacobsen, the president of RSA, which

included Jacobsen's statement that RSA "absolutely" could have paid its rent under the

lease agreement with money that RSA had "escrowed to make the payments . . . ." Tr. at

425. However, RSA put on substantial evidence countering Jacobsen's statement. In

particular, RSA's founder and CEO, Fuglei, testified that RSA lost approximately $1.58

---

[7] Bentley Forbes' own counsel at the time of these transactions, Shailendra Halbe, testified that he believed that Wehba Sr.'s decision to declare RSA in default on the computer consulting agreement was pretextual. Tr. at 943.

million during the first half of 2001, and thus was relying on the monthly promissory note payments from BFG and the monthly disbursements from Bentley Forbes to make its own lease payments to RSACO. Id. at 561. Fuglei further testified that when BFG and Bentley Forbes failed to make those monthly payments in June of 2001, the effect on RSA was "frankly catastrophic," rendering it unable to make its monthly lease payments. Id. at 580. Benjamin Kelly, who worked for RSA as the chief financial officer (on a contract basis), likewise testified that, as of June 2001, RSA was unprofitable and "in a tough cash situation." Id. at 1222. Thus, Kelly testified, the payments RSA was to receive from BFG and Bentley Forbes were important to RSA's ability to make its monthly lease payments.

### *Mid-Range's Cross-Appeal - No. 05-1160*

In its cross-appeal, Mid-Range contends that the district court erred in ruling that Mid-Range was not entitled to the 1.6 acre parcel of property as a matter of equity. Although Mid-Range acknowledges that the jury found in RSACO's favor on Mid-Range's claim for breach of the option agreement, it contends that this verdict was advisory only and not binding on the district court.

In ruling on Mid-Range's post-trial motion for judgment on its claim for breach of the option agreement, the district court addressed and rejected these same arguments:

> At trial, the jury found that neither RSACO nor BFG breached the option agreement between RSA Mid-Range and RSACO. RSA Mid-Range now asserts that it is entitled to judgment as a matter of equity regarding its claim that RSACO and BFG breached the option agreement. In particular, RSA Mid-Range asks the Court to order that the 1.6 acres of land subject to

the option agreement be returned to RSA Mid-Range.  It contends that even though the jury found that it failed to fulfill the conditions precedent to exercising the option agreement, the Court should treat the jury's verdict as advisory, find a breach of the agreement and return the property.  Both RSACO and BFG object to the motion.

During the jury charging conference, counsel for RSA Mid-Range contended that the issue of whether there was a breach of the option agreement should be decided by the jury, and the Court could later determine whether the equitable remedy of specific performance was appropriate.  At that time, RSACO and BFG objected to allowing the jury to decide the issue of breach, but they now seek to be bound by the verdict.  The Court stated that the jury's verdict would not be advisory as to the issue of breach but suggested that if this ruling was in error, it would take the jury's findings as advisory.

The Court stands by its original assessment that the jury's verdict as to the issue of breach was not advisory.  However, even if the verdict should be treated as advisory, RSA Mid-Range makes no compelling argument for the Court to disregard the jury's advice, and having reviewed the record, the Court is not inclined to reject the jury's finding.  Because there was no breach of the option agreement by RSACO or BFG, there is no available equitable remedy to be considered now.

Aplt. App. at 465-66.

We agree with the district court that the jury was not advisory.  To be sure, Mid-Range's claim for specific performance of the option agreement was equitable in nature and, as such, would typically have been tried to the court.  See Fischer Imaging Corp. v. General Elec. Co., 187 F.3d 1165, 1168-69 (10th Cir. 1999).  However, Federal Rule of Civil Procedure 39(c) allows a district court, in an action not triable of right by a jury, to "try any issue with an advisory jury . . . ."  Alternatively, a district court, "with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right."  Fed. R. Civ. P. 39(c).  We conclude the latter

provision applies in this case. According to the record on appeal, both sides, prior to trial, treated the claim as one that would be tried and decided by the jury.[8] Only during the jury instruction conference, which occurred at the close of all the evidence, was the possibility of an advisory jury first mentioned. Tr. at 1560-61. And, notably, Mid-Range argued at that time that it had elected, prior to trial, to have the claim decided by the jury. Id. Although RSACO/BFG objected at that point to the jury deciding the issue, the district court concluded that RSACO/BFG had waived its objection by failing to raise it at an earlier time. Id. at 1562. Given these circumstances, we conclude that the parties effectively consented to having the jury definitively decide Mid-Range's counterclaim. That consent is now binding, and the district court had no authority to treat the jury's verdict as advisory.[9] See Thompson v. Parkes, 963 F.2d 885, 888 (6th Cir. 1992) (holding that where no mention was made during trial preparation that the jury was to be advisory, the verdict ultimately reached by the jury had to be treated as if the trial by jury

---

[8] For example, the amended final pretrial order listed the breach of option agreement claim as one of the claims to be tried (including the various witnesses and exhibits relevant to the claim), and expressly indicated that "[t]he trial in this matter [wa]s to a jury." Aplt. App. at 264.

[9] Mid-Range argues that this court's decision in Dilley v. SuperValu, Inc., 296 F.3d 958, 965-66 (10th Cir. 2002), authorized the district court, even after the verdict, to treat the jury as advisory. Mid-Range, however, reads too much into Dilley. Indeed, there is no indication in Dilley whether or not the parties consented, prior to trial, to having the jury decide the issues. Even assuming, for purposes of argument, that Dilley would have authorized the district court to treat the jury's verdict in this case as advisory, it is clear from the record that the district court would have reached the same result.

had been as of a matter of right, and it was beyond the power of the district court to set aside the verdict on the theory that it was advisory).

Even assuming, for purposes of argument, that the jury's verdict was advisory, it is apparent from the record that the district court would have accepted the jury's finding, i.e., the district court would not have found in Mid-Range's favor on its claim for breach of the option agreement and thus would not have awarded specific performance. In particular, the district court specifically found, as noted above, that "there was no breach of the option agreement by RSACO or BFG . . . ." Aplt. App. at 465. Having reviewed the trial transcript, we conclude this finding was not clearly erroneous. In particular, there was no evidence presented at trial that Mid-Range submitted to RSACO either a notice of exercise of its intention to exercise its rights under the option agreement or an approved replat from the county, both of which were required under the option agreement.

AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

-20-