**ADT SECURITY SERVICES, INC., Plaintiff–Appellant and Cross–Appellee,**

v.

**PREMIER HOME PROTECTION, INC., Defendant–Appellee and Cross–Appellant,**

and

**Ronald Baskin, Defendant–Cross–Appellant.**

No. 05CA1769.

Colorado Court of Appeals, Div. III.

July 26, 2007.

Certiorari Denied April 21, 2008.

Sander Ingebretsen & Parish P.C., Richard G. Sander, Daniel E. Rohner, Denver, Colorado; Boies, Schiller & Flexner LLP, Stuart H. Singer, Carlos Sires, Fort Lauderdale, Florida, for Plaintiff–Appellant and Cross–Appellee.

Kelly Garnsey Hubbell + Lass LLC, Walter W. Garnsey, Jr., David R. Fine, Denver, Colorado, for Defendant–Appellee and Cross–Appellant and Defendant–Cross–Appellant.

Opinion by Judge BERNARD.

In this breach of contract case, plaintiff, ADT Security Services, Inc., appeals from the judgment and award of damages entered in favor of defendant Premier Home Protection, Inc. on Premier's counterclaim of breach of the covenant of good faith and fair dealing. Premier and defendant Ronald Baskin cross-appeal the judgment and award of damages entered in favor of ADT on ADT's claim for unpaid attrition chargebacks and lead fees. We affirm the judgment in ADT's favor on its claim, but reverse the judgment in Premier's favor on its counterclaim.

I.  Background

The following facts are undisputed. ADT, a subsidiary of a publicly traded company, Tyco International, Ltd., is a residential and commercial electronic security services company that markets its monitoring services through independent dealers. Premier was one of ADT's independent dealers. Baskin is Premier's sole owner and president.

On March 13, 1999, Premier entered into an Authorized Dealer Agreement (the agreement) with ADT. Baskin signed the agreement both individually and in his capacity as president of Premier.

The agreement authorized Premier to sell and install electronic security service systems in homes and small businesses, enter into alarm monitoring contracts with customers, and offer the alarm monitoring contracts to ADT for purchase. ADT determined the purchase price for the alarm monitoring contracts in accordance with provisions in the

Authorized Dealer Guidelines (guidelines), which were incorporated into the agreement.

Under § 9.2.4 of the agreement, dealers were required to pay a connection fee for each alarm monitoring contract sold to ADT. The connection fee was set forth in the guidelines, and ADT had discretion to change the guidelines. During the entire time Premier was an authorized dealer for ADT, the connection fee was set at $200.

In November 2002, ADT terminated Premier's dealership contract, and in July 2003, ADT sued Premier and Baskin (collectively, Premier) for fraud and breach of contract. ADT first claimed it was entitled to collect unpaid attrition chargebacks and lead fees (for the termination of alarm monitoring accounts because of nonpayment) from Premier because of alleged breach of contract and fraud in obtaining and selling alarm monitoring contracts to ADT. Premier countered ADT was not entitled to attrition chargebacks because ADT did not comply with collection procedures in the guidelines and terminated accounts early.

ADT's second claim was that Premier committed fraud by making false representations about the identity of account holders and credit card information on alarm monitoring contracts offered to ADT for purchase. Premier responded that, for specified account holders, Premier did not know about the false representations; for some account holders, ADT continued to collect payment even after learning of the misrepresentations; and for the remaining account holders, Premier was entitled to an offset for the monitoring fees collected by ADT.

Premier counterclaimed, alleging ADT had breached the contract by violating the implied covenant of good faith and fair dealing by not setting the connection fee on the basis of actual costs. ADT responded it did not breach the duty of good faith and fair dealing because the connection fees were offset by a bonus paid for alarm monitoring contracts. At oral argument on appeal, Premier indicated it relied solely upon the covenant of good faith and fair dealing as the basis for its breach of contract claim.

After a bench trial, the trial court found that, on ADT's breach of contract claim based on unpaid attrition chargebacks and lead fees, (1) ADT substantially complied with collection procedures; and (2) except for one account, ADT did not terminate accounts early. The trial court interpreted the guidelines to allow ADT to terminate alarm monitoring accounts that had been "in the collection process" for 120 days. Accordingly, the trial court entered judgment in favor of ADT and awarded ADT damages of $640,276 and prejudgment interest of $110,662.67. The trial court awarded Premier damages of $1,200 for the one account found to have been terminated early.

On ADT's fraud claims, the trial court found that (1) Premier committed identity theft for specified accounts; and (2) Premier committed fraudulent nondisclosure with respect to credit card information on specified accounts. The trial court awarded ADT damages of $16,171.60 on the identity theft claim, $64,735.32 on the credit card fraud claim, and $13,462 in prejudgment interest.

On Premier's counterclaim for breach of the duty of good faith and fair dealing, the trial court found that ADT breached the duty by charging Premier connection fees in excess of what ADT was entitled to charge. The trial court's finding was based on its conclusion that the term "connection fee" in § 9.2.4 of the agreement referred to a variable fee and not a fixed fee. The trial court entered judgment in favor of Premier and awarded Premier damages of $1,954,383 and prejudgment interest of $701,074.

## II. ADT's Appeal

ADT asserts the trial court erred in finding it breached the duty of good faith and fair dealing by charging connection fees in excess of actual costs because Premier's justified expectations in the contract were not violated by ADT's conduct. We agree and reverse.

### A. History of the Connection Fee

Section 9.2.4 of the agreement between ADT and Premier provides:

Immediately upon purchase, Authorized Dealer shall pay ADT a connection fee for

each Purchased Alarm Account in an amount set forth in the Guidelines. The parties acknowledge and agree that such connection fee is reimbursement for administrative expenses and costs associated with the cutin and connection associated with the Purchased Alarm Accounts, not a franchise fee.

As noted, during the period that Premier was a dealer for ADT (March 1999 to November 2002), the connection fee was set at $200 in the guidelines.

Before Premier became a dealer, the connection fee was devised by senior Tyco executives, in 1997, for the purpose of enhancing ADT's income. ADT began collecting the connection fee in late 1997; ADT executives were told that the connection fee was $200 and that the fee would be recorded as a credit to revenue, with the expenses amortized over the life of the contract. In April 1998, Tyco management asked ADT executives to prepare an analysis of costs incurred and services provided to the dealers in order to provide support for the $200 connection fee. In response, an ADT executive prepared a number of connection fee schedules with connection fees ranging from $57.40 to $200.10. A senior Tyco executive also became actively involved in preparing connection fee schedules, and in June 1998, estimated connection fees to be $239.06.

In October 2000, ADT lowered its estimate of connection fees to $108.87, prompting a senior Tyco executive to send out an email warning that a $90 reduction would have a financial impact nearing $45 million. Subsequently, a number of schedules were prepared to justify connection fees of at least $200. One of these schedules estimated connection fees at $286.57.

In January 2001, ADT—without informing its dealers—modified § 9.2.4 in the agreement to delete the language that referred to the connection fee as reimbursement for administrative expenses and costs. From April 2001 to June 2002, ADT continued to prepare various connection fee schedules. In November 2002, ADT terminated Premier's contract.

The connection fee transactions between ADT and its dealers then became the subject of an investigation by the Securities and Exchange Commission (SEC). As a result of this investigation, ADT discontinued the connection fee and the offsetting bonus in 2003. In April 2006, the SEC filed a civil injunctive action against Tyco, in the United States District Court for the Southern District of New York.

The SEC's complaint in that action alleged that Tyco, in 1997, implemented a scheme designed to overstate its operating income in connection with transactions between ADT and its dealers. The SEC alleged that Tyco management directed ADT to implement a $200 connection fee to be paid by dealers to ADT for each alarm monitoring contract purchased and to simultaneously increase the price ADT paid the dealers for those contracts by $200. Tyco referred to this offsetting payment as a "growth bonus." The SEC alleged that because the $200 connection fee was offset by the $200 growth bonus, the transaction should not have been recognized under generally accepted accounting principles. Accordingly, the SEC alleged, Tyco inflated its operating income by approximately $567 million from September 1998 through December 2002. Tyco settled this action with the SEC in April 2006.

## B. Duty of Good Faith and Fair Dealing

ADT first argues that, as a matter of law, it could not have breached the duty of good faith and fair dealing, because a breach requires bad faith or deceit. ADT contends it did not act in bad faith, because it offset the connection fee with the bonus by increasing the purchase price paid to dealers. We decline to address this issue, because it is raised for the first time on appeal. *Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n. 5 (Colo.1992).

ADT's second argument is that the trial court erred in finding that it breached the duty of good faith and fair dealing, because Premier's justified expectations under the contract were not violated by ADT's conduct. We agree. We conclude the trial court's judgment on this issue and the associated award of damages must be reversed.

### 1. Elements of the Implied Covenant

A duty of good faith and fair dealing is implied in every contract subject to the Uniform Commercial Code. Section 4–1–304, C.R.S.2006. This duty applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo.1995).

The concept of discretion in performance "refers to one party's power after contract formation to set or control the terms of performance." Discretion occurs when the parties, at formation, defer a decision regarding performance terms of the contract. *Amoco Oil Co., supra,* 908 P.2d at 498 (citation omitted) (quoting Steven J. Burton, *More on Good Faith Performance of a Contract: A Reply to Professor Summers,* 69 Iowa L.Rev. 497, 501 (Jan.1984) ).

The good faith performance doctrine is generally used to give effect to the intentions of the parties or to honor their reasonable expectations. Good faith performance of a contract involves "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Amoco Oil Co., supra,* 908 P.2d at 498 (quoting *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.,* 872 P.2d 1359, 1363 (Colo.App.1994)); *see also* Restatement (Second) of Contracts § 205 cmt. a (1981).

A party's justified expectations are violated if evidence indicates it would not have signed the contract had it known of the manner in which the party given discretion would exercise its discretion to determine open terms under a contract. *See Amoco Oil Co., supra,* 908 P.2d at 499 ("[A]lthough the dealers left the rental calculation to Amoco's discretion, they presumably would not have signed the agreements had they known Amoco would charge a duplicate amount for service bays."). Thus, the implied covenant of good faith and fair dealing is breached when a party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract. *Wells Fargo Realty Advisors Funding, Inc., supra,* 872 P.2d at 1363.

However, the duty of good faith cannot be used to contradict terms or conditions for which a party has bargained. *Amoco Oil Co., supra,* 908 P.2d at 498; *see Shiplet v. First Sec. Bank, Inc.,* 234 Mont. 166, 762 P.2d 242, 246 (1988) ("[It] appears the gravamen of the statutory [UCC] good faith requirement is whether the terms of the agreement were carried out faithfully."), *overruled on other grounds* by *Sacco v. High Country Indep. Press, Inc.,* 271 Mont. 209, 896 P.2d 411 (1995). The doctrine does not obligate a party to accept a material change in the terms of the contract, or to assume obligations that vary or contradict the contract's express provisions, nor does it permit a party to inject substantive terms into the contract. *Wells Fargo Realty Advisors Funding, Inc., supra,* 872 P.2d at 1363.

### 2. Justified Expectations

We conclude that ADT's conduct was not contrary to Premier's justified expectations, as established by the language of the contract.

Section 9.2.4 of the agreement between ADT and Premier, which defined the connection fee as a reimbursement, indicated the connection fee was variable. In addition, § 9.2.4 gave ADT discretion to set the connection fee. The connection fee was set at $200 in the guidelines when Baskin signed the agreement on behalf of Premier and himself, and the fee remained the same during the duration of Premier's contract.

The purchase price ADT would pay Premier for each alarm monitoring contract was not specified in the agreement or the guidelines. However, testimony at trial indicated Premier received about $1200 for each alarm monitoring contract, less the connection fee. There was no reference to a growth bonus in either the agreement or in the guidelines. Before entering into the agreement, ADT did not disclose to Premier that the connection fee was designed, as part of an accounting scheme, to be offset by a growth bonus that increased the purchase price for each alarm monitoring contract.

Premier argued at trial that its justified expectations under the contract were that

ADT would calculate the amount of the reimbursements due to ADT under § 9.2.4 based upon the actual cost of the connecting fee. However, Premier was aware that the connection fee remained at $200 throughout the life of the contract, and that it received the same net amount from ADT for each alarm monitoring contract.

The trial court did not directly address the issue of what Premier's justified expectations were. Instead, the trial court focused on ADT's conduct, finding that (1) the history of the connection fee revealed that ADT did not fix the $200 connection fee based on actual administrative costs and expenses—ADT only attempted to justify the connection fee after charging the $200; (2) ADT included items in the connection fee schedules that should not have been included, such as a welcome kit, interest on funds utilized to acquire an account, a trademark fee, and a management fee; and (3) Tyco admitted in its filings with the SEC that ADT "determined the amounts reimbursed from dealers under ADT's authorized dealer program exceeded the costs actually incurred." Based on these findings, the trial court concluded ADT breached the duty of good faith and fair dealing by charging Premier in excess of what it was entitled to charge for the connection fee.

Although these determinations were sufficient to support a conclusion that the connection fee was not, in fact, based upon the actual costs associated with connecting accounts, the trial court did not resolve what Premier's justified expectations were and how ADT's conduct defeated those expectations. Because we have previously concluded the contract unambiguously described the connection fee as variable, the record allows us to conclude it was Premier's justified expectation that the fee would be based upon actual costs and any recalculations would be based upon future changes in costs.

However, there is no indication in the contract to suggest the costs were more likely to rise or to fall, or that costs would be regularly recalculated. There is no evidence in the record to indicate Premier would not have entered into the contract had it known the connection fee was not based on actual costs

and it would have to pay the $200 connection fee for each customer it recruited during the contract. When Baskin signed the contract containing the connection fee language, the accompanying guidelines indicated the connection fee was $200. We therefore conclude it was Premier's justified expectation that it would be charged a connection fee of $200 for each contract, unless and until the connection fee was raised or lowered, and that Premier did not have a justified expectation the connection fee would be increased or decreased at any particular time.

We conclude that ADT's performance of the contract associated with the connection fee—treating it as a fixed fee contrary to the plain language of the agreement—did not deny Premier "the benefit of the contract." *See Wells Fargo Realty Advisors Funding, Inc., supra*, 872 P.2d at 1363. Although Baskin testified it was important to him that the connection fee be calculated accurately because it was "a large sum of money," and that Premier should be reimbursed by the portion of the connection fee Premier paid for each customer agreement that did not represent the actual costs of the connection fee, Premier knew what the connection fee was at the time it entered into the contract. It could, based upon the $200 figure, calculate its costs, anticipate its income, and project its profits before the contract's formation. There was no guarantee that the connection fee would rise or fall during the contract's term, and the connection fee never changed during the business relationship. We therefore conclude Premier would have presumably entered into the contract even had Premier known that ADT was treating the connection fee as a fixed fee, offset by a growth bonus, that would not change during the contract's life. *See Amoco Oil Co., supra*, 908 P.2d at 499.

Premier relies heavily on *Amoco Oil Co., supra*, to support its position that ADT's conduct denied Premier's justified expectations. However, this case is distinguishable from *Amoco Oil Co*. There, although precise rental figures were established at the time of the agreement's formation, Amoco retained discretion to modify the rental terms, thus keeping the terms open and requiring the

dealers to depend upon Amoco's good faith in setting new figures. Amoco adjusted the figures in a way that disadvantaged the gasoline dealers, leading to a conclusion that Amoco had violated the implied covenant of good faith and fair dealing.

Here, as in *Amoco Oil Co.*, the contract gave ADT discretion to set the connection fee in the guidelines. At the time the contract was signed, the guidelines stated the connection fee was $200. Although ADT reserved the right to change the connection fee, thus maintaining some future discretion over the amount of the fee, Premier knew, at the time of the contract's formation, what the fee would be. However, unlike in *Amoco Oil Co.*, there was no modification of the connection fee during the business relationship between ADT and Premier.

The determination of the amount of the connection fee, an important term of the contract's performance, was not deferred, because Premier knew the amount of the fee when the contract was signed, and the fee never changed. Therefore, the implied covenant was not breached under these circumstances, because there was no exercise of "discretion in performance" by ADT that denied Premier the benefit of the contract. *Amoco Oil Co., supra,* 908 P.2d at 498; *cf. Bayou Land Co. v. Talley,* 924 P.2d 136, 154 (Colo.1996) ("even if the implied covenant [of good faith and fair dealing] were to arise in a deed of trust context, it would not be violated by" the actions of the party possessing discretion under the contract).

Accordingly, although we agree with the trial court's interpretation of the term "connection fee" in § 9.2.4 of the agreement as referring to a variable fee, not a fixed fee, we reverse the judgment on Premier's claim that ADT breached the implied covenant of good faith and fair dealing, and the damages awarded in connection with that claim.

### III.   Premier's Cross-Appeal

Premier argues that the trial court erred in holding that, except for one alarm monitoring account, ADT did not prematurely terminate accounts for nonpayment, and thus, ADT is entitled to attrition chargebacks. Premier contends the trial court failed to adopt the correct interpretation of the relevant provisions and failed to consider appropriate extrinsic evidence. We disagree.

### A.   Attrition Chargeback Provisions

For alarm monitoring accounts terminated for nonpayment, the agreement required Premier to pay ADT an "attrition chargeback," which was equal to the purchase price paid by ADT for the account (about $1200). Section 15 of the agreement provided:

> During the term of this Agreement and for as many as twelve months (12) months thereafter … Authorized Dealer shall be charged the Attrition Chargeback with respect to Purchased Alarm Accounts that become Canceled Alarm Accounts or Non-Producing Alarm Accounts. The guidelines and procedures to be used with respect to Authorized Dealer's Attrition Chargeback are more specifically set forth in the Guidelines.

"Canceled Alarm Accounts" are defined in the guidelines as "Purchased Alarm Accounts which, from time to time, are designated by ADT as canceled." "Nonproducing Alarm Accounts" are defined as "(i) any Purchased Alarm Account for which the total accounts receivable balance is equal to or greater than three (3) times the MRR [Monthly Recurring Revenue], and (ii) at least one MRR is ninety (90) or more days past due." The MRR is defined as the "total recurring regular monthly amounts due from Subscribers pursuant to their respective Service Agreements."

Collection practices with regard to termination of accounts are contained in two versions of the guidelines that were in effect during Premier's contract with ADT. The 1999 guidelines provided, "On the last day of each fiscal month, we cancel all accounts with account receivable balances greater than or equal to 120 days old."

The 2001 guidelines specified cancellation procedures for accounts "90 days past due" and "120 days past due." For accounts "90 days past due," the guidelines provided that "[a]ccounts scheduled to hit 120 days past due by month end will also be sent a certified letter providing 10 days notice of termination

of alarm service." On the last day of the fiscal month, accounts that had not been paid were to be canceled. For accounts classified as "120 days past due," those account holders who had not received a cancellation letter (providing ten days notice) were to be sent such a letter, and accounts were to be canceled if not paid after ten days.

## B. Analysis

■ Premier contends that the term "120 days past due" means that an account is subject to termination for nonpayment and collection of attrition chargebacks only if it had 120 days of accrued delinquent MRR at the termination date. ADT counters that the 120 day period before cancellation begins on the date the customer first enters the collection process. The trial court held that the term "120 days past due" was ambiguous and then interpreted the term to mean that accounts are subject to termination when they are in the collection process for 120 days. We agree with the trial court.

■ Whether a written contract is ambiguous is a question of law we review de novo. *Pub. Serv. Co. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006). A contract is ambiguous when it is reasonably susceptible of more than one meaning. *Pub. Serv. Co., supra*, 132 P.3d at 339. When an ambiguity is found to exist that cannot be resolved by reference to other contractual provisions, the trial court must consider extrinsic evidence in order to determine the parties' intent. *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo.1984).

■ The extrinsic evidence a trial court considers may include "any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement." *Pepcol Mfg. Co., supra*, 687 P.2d at 1314 (citing *Nahring v. City & County of Denver*, 174 Colo. 548, 552, 484 P.2d 1235, 1237 (1971)). Once a contract is determined to be ambiguous, the meaning of its terms is a question of fact, *Pepcol Mfg. Co., supra*, 687 P.2d at 1314, and the findings of the trial court must be accepted on review, unless they are so clearly erroneous as not to find support in the record, *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1384 (Colo.1994).

We conclude that the term "120 days past due" is facially ambiguous; the guidelines do not clarify whether accounts can be terminated only when there are 120 days of accrued unpaid MRR, or whether accounts can be terminated 120 days from the first unpaid MRR. The term could reasonably be interpreted in either of the two ways proposed by the parties.

After correctly determining that the term "120 days" was ambiguous, the trial court found that accounts are subject to termination when they are in the collection process for 120 days. The trial court based its finding on the stated purpose of the collection procedure in the guidelines, which was to improve customer retention, improve cash flow, and collect the entire balance due to ADT. The trial court's finding is also supported by testimonial evidence provided by an ADT witness.

The record supports the trial court's determination of the meaning of the ambiguous term "120 days past due," and, therefore, we agree with the trial court's ruling as to the claim for attrition chargebacks.

## IV. Attorney Fees

Finally, ADT asserts that, because the trial court entered an award of attorney fees in favor of Premier based on the connection fee findings, the attorney fee award should be vacated if we reverse the trial court's decision. We agree.

Absent other agreement or rule, the prevailing party shall be granted costs and fees. *Weeks v. City of Colorado Springs*, 928 P.2d 1346, 1350 (Colo.App. 1996). If a judgment is reversed on appeal, the award of fees and costs should also be vacated. *See Rossman v. Seasons at Tiara Rado Associates*, 943 P.2d 34, 38 (Colo.App. 1996).

The judgment is reversed as to Premier's counterclaim of breach of the implied covenant of good faith and fair dealing and the related award of damages. Therefore, we also vacate the trial court's ruling on attorney fees. *See id.*

ADT requests that we award ADT attorney fees and costs for this appeal. We agree, but we remand to the trial court to determine reasonable attorneys fees incurred on appeal. *See BA Mortg., LLC v. Quail*

*Creek Condominium Ass'n, Inc.,* —— P.3d ——, ——, (Colo.App. No. 06CA0246, Mar. 13, 2008). The judgment is affirmed in all other respects.

Judge ROY concurs.

CRISWELL *, J., specially concurs.

Judge CRISWELL specially concurring.

I fully agree with Part III of the majority opinion. I also agree with the majority's conclusion in Part II that the evidence here would not support a finding that ADT's failure to change the amount of the connection fee, that is, its inaction, resulted in a denial of Premier's reasonable expectations.

However, I have serious reservations whether the claim being asserted by Premier with respect to the amount of the connection fee implicates the covenant of good faith and fair dealing, in any case.

I agree, of course, that such a covenant inheres in every contract. I also agree that it may be used to condition a party's exercise of a discretionary authority given by the contract. In my view, however, the covenant is implicated *only* if the contract does not set forth any *other* criteria for the exercise of such discretion. It is the covenant's standard of good faith that is used to judge the legitimacy of the exercise of discretion only if there is no other standard established by the contract therefor.

In *Amoco Oil Co. v. Ervin,* 908 P.2d 493 (Colo.1995), for example, the contract between Amoco and its various dealers allowed Amoco to change the stations' rental rate, but it did not set forth any criteria that it was to use in establishing such a rate. Hence, when Amoco established a rental rate based on several factors, but used duplicating factors in at least one instance, the covenant of good faith and fair dealing was relied upon to invalidate the rental rate, even though nothing in the express contract itself prohibited use of the formula employed by Amoco.

Here, in contrast, both the trial court and we agree that the express terms of this contract required the establishment of a connection fee based upon certain expenses incurred by ADT. Hence, once the trial court found that the amount of the connection fee was *not* based on these expenses, the conclusion is manifest that ADT's failure to adjust the initial fee was a violation of the *express terms* of the parties' agreement. Under such an analysis, the covenant of good faith and fair dealing need not be relied upon, and therefore, neither party's "reasonable expectations" become relevant.

Nevertheless, Premier made clear both in the trial court and in counsel's argument before us that it was *not* relying upon any claimed violation of an express term of the agreement; it emphasized that it was relying solely upon a violation of the covenant. And, for the reasons given by the majority, it failed to prove such a violation.