**RHINO FUND, LLLP, Third–Party Plaintiff–Appellee,**

v.

**Michael W. HUTCHINS, Third–Party Defendant–Appellant.**

**No. 06CA1172.**

Colorado Court of Appeals, Div. I.

June 26, 2008.

As Modified on Denial of Rehearing Dec. 24, 2008.

Certiorari Dismissed March 17, 2009.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2007.

Sander, Ingebretsen & Parish, P.C., Daniel F. Wake, Denver, Colorado, for Third–Party Plaintiff–Appellee.

Walter H. Sargent, P.C., Walter H. Sargent, Colorado Springs, Colorado, for Third–Party Defendant–Appellant.

Opinion by Judge ROTHENBERG.

Michael W. Hutchins appeals a judgment of the trial court, following a bench trial, finding him personally liable to The Rhino Fund, LLLP for conversion and civil theft. We affirm.

## I. Background

Rhino is a private investment management company. It describes itself as a private "fund of funds" that invests in hedge funds and other "market neutral" investments and reports that it typically invests in the funds and activities of between twelve and fifteen outside investment managers. A hedge fund is "an investment vehicle in which sophisticated institutions and individuals of high net worth pool investments," and its core business is "to earn high returns for investors." *Long Term Capital Holdings v. United States*, 330 F.Supp.2d 122, 129 n. 5 (D.Conn. 2004), *aff'd*, 150 Fed.Appx. 40, 2005 WL 2365336 (2d Cir.2005).

This lawsuit arose as the result of three agreements entered into between Rhino and All Terrain Property Funds, LP, a business that acquired nonperforming loans (NPLs) at a discount and attempted to sell or collect on them at a profit. The owners of most of the various All Terrain entities were limited liability companies owned by Hutchins's wife and his children. All were managed by Hutchins, and he also managed the day-to-day operations of All Terrain. Charles Berling was responsible for acquiring, managing, and disposing of All Terrain's real property, and David Pavek was its legal counsel.

In 2003, All Terrain wanted to initiate a new fund (the All Terrain fund) and approached Rhino about investing in it. Rhino and All Terrain executed three documents describing the transaction: an Investor Agreement, a Collateral Assignment of Net Proceeds Agreement, and a Promissory Note. Rhino agreed to lend $1.25 million and, as collateral, All Terrain pledged the proceeds from six specific NPLs that were in the process of collection to secure repayment of Rhino's $1.25 million. According to All Terrain's written estimates, the value of those six collateral assets was at least $1.6 million. The Collateral Assignment of Net Proceeds Agreement identified the six specific assets in a Schedule of Collateral that was pledged by All Terrain to secure repayment of Rhino's loan.

Section 1.1 of the Collateral Assignment was entitled "Pledge of Collateral" and provided, as relevant here, that "Assignors [who were multiple All Terrain entities] hereby convey their rights, title, and interest to [Rhino] with respect to the Proceeds derived from the collection of Collateral to the extent sufficient to repay [Rhino] both the principal and interest owed to it based upon the Note." Section 1.1 also provided that the Assignors would "assign the proceeds of the Collateral ... to the Assignee to act as security for the Assignee's investment in" All Terrain (the collateral proceeds).

The Promissory Note stated that "security for this Promissory Note is governed by that certain Collateral Assignment of Net Proceeds ... [and] is to be construed in connection with the Collateral Assignment as well as the Investor Agreement." The Promissory Note also established an escrow account for the benefit of Rhino. It required that all "proceeds" from the six NPLs that were collected by All Terrain be placed in an escrow account, and that "[i]f there are less than sufficient funds in the escrow account in the event of the need for repayment [to Rhino], all proceeds in the account shall be paid to [Rhino], and interest shall continue to accrue, until such times as the remaining accounts receivable are collected and placed into the escrow account." Rhino also received an option to convert the loan into equity in All Terrain's start-up fund, which had to be exercised within one year.

In 2004, Rhino learned that All Terrain had begun to liquidate the assets referred to in the Schedule of Collateral, but that the proceeds from All Terrain's collections had not been placed in an escrow account and had been used for other purposes. Indeed, Rhino learned that contrary to All Terrain's written representations, All Terrain had never opened an escrow account. When Rhino contacted Hutchins about this, he took the position that the $1.25 million that Rhino had paid was equity in All Terrain and not debt.

Because the parties disagreed regarding the proper characterization of Rhino's financial contribution, All Terrain filed this action seeking a declaratory judgment. Rhino counterclaimed against All Terrain, seeking repayment of the $1.25 million plus interest. It also filed a third-party complaint against

Hutchins, Pavek, and Berling for conversion, civil theft, and securities fraud. Pavek and Berling entered into settlement agreements with Rhino and are not parties to this appeal.

The trial court granted Rhino's motion for partial summary judgment, concluding All Terrain was liable for $1,691,125 plus interest for breach of the promissory note, and for at least $712,055 for breach of the Collateral Agreement. All Terrain has not appealed that judgment.

Following a bench trial, and as relevant here, the trial court rejected Rhino's claim that Hutchins was the alter ego of All Terrain. However, the court found him personally liable under the civil theft statute for diverting $200,000 from proceeds that were to be escrowed and for the conversion of $714,951. The court also assessed treble damages against him and awarded Rhino its costs and attorney fees.

## II. Hutchins's Personal Liability

Hutchins contends the trial court erred in finding him personally liable to Rhino for conversion and civil theft. He maintains that under Section 15 of the parties' Investor Agreement, All Terrain and Rhino waived any personal liability of the other company's employees or officers under or in connection with the Investor Agreement. We agree the plain language of Section 15 purports to bar Rhino's action. But we further conclude that, on the particular facts presented, this provision does not insulate Hutchins from personal liability for his intentional torts of conversion and civil theft.

 Contract interpretation is a question of law that is reviewed de novo, and an appellate court need not defer to a lower tribunal's interpretation of the contract. *Ad Two, Inc. v. City & County of Denver,* 9 P.3d 373, 376 (Colo.2000). When a contract is unambiguous, the court must give effect to the contract as written unless the contract is voidable on grounds such as mistake, fraud, duress, undue influence, or the like, or unless the result would be an absurdity. *Ringquist v. Wall Custom Homes, LLC,* 176 P.3d 846, 849 (Colo.App.2007).

## A. The Contract Is Not Ambiguous

 In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meanings of the words used, and reference must be made to all the contract's provisions. A contract is ambiguous when it is reasonably susceptible of more than one meaning. *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310, 1314 (Colo.1984); *see ADT Sec. Servs., Inc. v. Premier Home Prot., Inc.,* 181 P.3d 288, 296 (Colo.App.2007).

Neither Rhino nor Hutchins has contended the three agreements are ambiguous. The trial court concluded the three contracts should be read together, and "[w]hen read together, the documents are unambiguous." We agree with that conclusion.

## B. Did Rhino Make a Loan?

 The trial court also found the funds Rhino had paid to All Terrain constituted a loan and not the purchase of an equity interest. The court stated: "The plain language of the Promissory Note makes clear that Rhino's funds were a loan to All Terrain unless Rhino exercised its right within the following twelve months to convert that loan into a purchase of equity in All Terrain (the Ownership Option)."

We agree and uphold the trial court's conclusion that, under the plain language of the agreements, the funds that Rhino paid to All Terrain constituted a loan.

## C. Does Section 15 Violate Public Policy?

The trial court next addressed Hutchins's argument that Section 15 of the Investor Agreement barred Rhino from seeking damages against him personally. That provision states:

> Limitations: No present or future advisor, trustee, director, officer, partner, attorney, employee, shareholder or agent of [Rhino or All Terrain], or any partner in any of them shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into in connection with this Agreement and [Rhino and All Ter-

rain] and their successors and assigns hereby waive any and all such personal liability.

The trial court concluded: "Section 15 of the Investor Agreement does not prevent Rhino from asserting its claim for conversion. That section only contemplate[s] a limitation of remedies if the collateral proceeds were properly applied to repayment of Rhino's loan." The court alternatively concluded that Section 15 of the Investor Agreement also violates public policy and is unenforceable to the extent it purports to bar Rhino from asserting a claim for conversion, and the court cited Restatement (Second) of Contracts § 195 (1981) in support of its conclusion. We agree with the court's alternative conclusion.

■ Rhino and All Terrain clearly sought to insulate their agents, officers, and shareholders from any personal liability, "directly or indirectly, under or in connection with [the Investor Agreement] or any agreement or instrument made or entered into in connection with [the Investor Agreement]." The other two agreements that formed the contract also were made in connection with the Investor Agreement. Accordingly, Section 15 of the Investor Agreement on its face appears to bar this action by Rhino, unless the provision violates public policy in Colorado.

The Colorado Supreme Court has not adopted Restatement (Second) of Contracts § 195 (1981), and the parties have not cited any published Colorado opinions construing it. However, there is authority in Colorado and other jurisdictions generally discussing exculpatory and limiting provisions in a contract.

■ As a general rule, courts will uphold an exculpatory provision in a contract between two established and sophisticated business entities that have negotiated their agreement at arm's length. *See Orion Refining Corp. v. UOP,* 259 S.W.3d 749, 763 (Tex.App. 2007) (Texas court applied Illinois law, noting that Illinois decisions reflect "a widespread policy of permitting competent parties to contractually allocate business risks as they see fit" (quoting *McClure Eng'g*

*Assocs., Inc. v. Reuben H. Donnelley Corp.,* 95 Ill.2d 68, 69 Ill.Dec. 183, 447 N.E.2d 400, 402–03 (1983)) ).

For example, in *B & B Livery, Inc. v. Riehl,* 960 P.2d 134, 135 (Colo.1998), a horseback rider suffered injuries when she fell from a horse rented from B & B Livery, Inc. The Colorado Supreme Court, relying on a statute governing equine activities, upheld the validity of a general release agreement, concluding it unambiguously showed the parties' intent to extinguish the livery's liability for negligent injuries to a rider. *Id.* at 136; *see* § 13–21–119(1), C.R.S.2007. The court observed that "exculpatory agreements have long been disfavored," but added that they are not necessarily void as long as one party is not "at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence." *B & B Livery,* 960 P.2d at 136 (quoting *Heil Valley Ranch, Inc. v. Simkin,* 784 P.2d 781, 783 (Colo.1989), and W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 482 (5th ed.1984) ).

However, the supreme court remanded the case for further proceedings on the rider's "willful and wanton/gross negligence claims." *Id.* at 139; *see* § 13–21–119(4)(b)(III)–(IV), C.R.S.2007 (providing that limitation on liability does not apply if the injury resulted from "an act or omission [by the equine professional] that constitutes willful or wanton disregard for the safety of the participant and that act or omission caused the injury" or the equine professional "[i]ntentionally injures the participant").

Most courts will not enforce exculpatory and limiting provisions if they are unconscionable, if they result from unreasonable bargaining power, or if they purport to relieve parties from their own willful, wanton, reckless, or intentional conduct. *Heil Valley Ranch, Inc.,* 784 P.2d at 783; *see Jones v. Dressel,* 623 P.2d 370, 376 (Colo.1981)("An exculpatory agreement, which attempts to insulate a party from liability from his own negligence, must be closely scrutinized, and in no event will such an agreement provide a shield against a claim for willful and wanton negligence."); *Valhal Corp. v. Sullivan Associates, Inc.,* 44 F.3d 195, 202 (3d Cir.

1995)("[A]n exculpatory or indemnity clause will ... not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence.") (applying Pennsylvania law).

We have found no Colorado cases, and Hutchins has cited only a handful of cases from other jurisdictions, upholding or enforcing exculpatory clauses that permit parties to be completely absolved of their intentional, fraudulent, or reckless acts. We discuss below the authority on which Hutchins relies and why we find it unpersuasive.

Some, but not all, of the courts that have refused to uphold exculpatory clauses where the alleged harm was caused intentionally or recklessly, have relied on section 195(1) of the Restatement (Second) of Contracts. It provides that "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." *See Wright v. Sony Pictures Entm't, Inc.*, 394 F.Supp.2d 27, 33 (D.D.C.2005) (adopting Restatement approach and concluding waivers do not exempt a party that recklessly or intentionally causes harm); *see also Airfreight Express Ltd. v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 158 P.3d 232, 240 (App.2007) (relying on section 195 of Restatement, which prohibits contracts that exempt parties from intentional or reckless tort liability; concluding a party may contract to limit liability for nonperformance of promises, but not where the party acts fraudulently or in bad faith); *Finch v. Southside Lincoln–Mercury, Inc.*, 274 Wis.2d 719, 685 N.W.2d 154, 160, 163–64 (App.2004)(relying on section 195 of Restatement, court concluded exculpatory clauses in lease agreements were unenforceable based on public policy, where the alleged harm is caused intentionally or recklessly); *Fremont Homes, Inc. v. Elmer*, 974 P.2d 952, 956–57 (Wyo.1999)(adopting section 195 of Restatement and concluding limitation of remedies provision could not exempt party from liability for intentional torts).

Hutchins contends this case is distinguishable because the agreements here were between Rhino and All Terrain, and those entities did not purport to exempt themselves from liability by virtue of Section 15. Each party merely waived the personal liability of the other's officers, employees, and agents. Hutchins maintains that such a waiver of personal liability "is consistent with [Colorado's] public policy and established law sharply limiting the circumstances under which corporate officers and other agents ... may be held personally liable in tort, even where the allegedly tortious conduct is intentional."

However, the cases on which he relies are distinguishable. In *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 861 (Colo.2004), the plaintiff was a member of a neighborhood association that challenged a developer's plan to build a large apartment complex near her property. When the plaintiff was sued by the developer for tortious interference with contract, the plaintiff defended on First Amendment grounds and later sought attorney fees. The court held, among other things, that the members of a nonprofit homeowners association, such as the plaintiff, were not individually bound by a contract entered into by the organization. *Id.* at 868. Accordingly, the case offers us no guidance here.

In *Powell Products, Inc. v. Marks*, 948 F.Supp. 1469, 1478 (D.Colo.1996), the plaintiff alleged, as relevant here, that four officers of a corporation were personally liable for inducing the corporation to breach its contract. But the trial court found that the officers had acted in their official capacities for the corporation, and that there was no evidence they were motivated by anything but a desire to benefit the corporation. Here, in contrast, the trial court found that Hutchins diverted funds, which should have been escrowed, and that he did so for the purpose of benefiting himself and his family.

In *Union Mutual Life Insurance Co. v. Chrysler Corp.*, 793 F.2d 1, 11–12 (1st Cir. 1986), the court stated that "[i]n the absence of malice, one who knowingly and voluntarily contracts with a corporation must look to the corporation, not to its officers, for redress, even for 'obvious' failures to perform contractual promises." However, the court concluded a corporate officer could not be held personally liable "where as here, there [was] no independent evidence that [he] acted for other than a corporate purpose." *Id.* at 11. In

this case, the trial court found that Hutchins acted for personal gain.

In *Knouse Foods Co-op., Inc. v. Burns International Security Services, Inc.*, 519 F.Supp. 867 (E.D.Pa.1981), the employee of a security company committed arson at a client's warehouse, causing extensive damages. The client sued the security company for the negligent supervision of its employee, not for an intentional tort. The federal district court, applying Pennsylvania law, concluded a contractual provision *limiting an employer's liability* for its employees' intentional acts to $50,000 per occurrence was not void as against public policy. *Id.* at 869. Thus, *Knouse* is factually distinguishable.

Hutchins's reliance on *Universal City Development Partners, Ltd. v. Ride & Show Engineering*, 2006 WL 845167 (M.D.Fla. No. 6:04–CV–781–ORL28–JGG, Mar. 30, 2006)(unpublished order), is also misplaced. In that patent infringement case, the federal court—applying Florida law—upheld the parties' settlement agreement, which included a release of liability. In doing so, however, the federal court acknowledged Florida's public policy "against release clauses which endeavor to release parties from claims for fraudulently inducing others into the very contracts in which the release clauses are contained." *Id.* (citing *Oceanic Villas, Inc. v. Godson*, 148 Fla. 454, 4 So.2d 689 (1941)); *see Mankap Enters., Inc. v. Wells Fargo Alarm Servs.*, 427 So.2d 332, 333–34 (Fla.Dist.Ct. App.1983)("The law is settled that a party cannot contract against liability for his own fraud....").

The trial court here found that (1) Hutchins wrongly commingled the collateral proceeds that should have been placed in an escrow account to secure Rhino's loan; (2) through Pavek, he led Rhino to believe there was an escrow fund when no such fund ever existed; (3) he refused his attorney's advice that at least some of the proceeds be escrowed; (4) he had final authority to determine how All Terrain treated the proceeds of the collateral; (5) he paid his own salary with the proceeds of the collateral; (6) he also used $200,000 to pay down a line of credit for his personal advantage and without proper authorization from Berling; and (7) he failed

to show he acted in good faith or on the advice of counsel.

Under these circumstances—where Hutchins's actions were not merely negligent and were not taken to benefit All Terrain but were found to be intentional, unauthorized, and self-serving, and where the exculpatory provision was of no practical benefit to Rhino—we conclude Section 15 of the Investor Agreement is unenforceable to the extent that it purports to exempt Hutchins from personal tort liability. *See* Restatement § 195(1). Hence, the trial court did not err in holding Hutchins personally liable for conversion and civil theft despite the plain language of Section 15 of the Investor Agreement.

### III. Does the Economic Loss Rule Apply?

■ Hutchins next contends the economic loss rule precluded the trial court from imposing tort liability upon him. We disagree.

■ The economic loss rule preserves the distinction between contract and tort law when only economic damages are sustained, by requiring the court to focus on the contractual relationship between the parties in determining whether there is an independent duty of care. *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1263 (Colo.2000). If the tort claims are based on duties that are imposed by contract, then contract law provides the remedies for economic losses. *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo.2004); *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1107 (Colo.App.2004). However, the economic loss rule does not apply where the defendant owes the plaintiff a duty of care that is independent of any contractual duty. *Town of Alma*, 10 P.3d at 1263; *Andrews v. Picard*, 199 P.3d 6, 10 (Colo.App. 2007). The existence and scope of a tort duty is a question of law to be determined by the court. *A.C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d 862, 866 (Colo. 2005); *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 465 (Colo.2003).

In *Burke v. Napieracz*, 674 So.2d 756, 758–59 (Fla.Dist.Ct.App.1996), the plaintiff alleged that an authorized signatory of her personal savings account, who had agreed to

receive and deposit her monthly Social Security checks and forward the funds to her, did not merely fail to perform under the agreement, but affirmatively and intentionally converted funds to his own use by stealing money that was entrusted to him. The court concluded the plaintiff had stated claims for conversion and civil theft that were not barred by the economic loss rule because the claims alleged independent acts that were separate from any direct contractual requirement. The Florida court stated:

> Where, as here, it was not merely a failure to perform, but an affirmative and intentional act of converting the funds to his own use by allegedly stealing the monies [with] which he was entrusted, there is not merely a breach of contract but a separate and independent tort. We conclude that [the plaintiff] averted the economic loss rule bar by alleging ... a duty on the part of [the defendant] not to convert the social security funds, and ... a violation of a legislatively imposed duty to avoid civil theft. Furthermore, with regard to the claim for civil theft, under the circumstances of this case, we decline to allow the economic loss rule to abrogate a legislatively created scheme designed to extend a civil remedy to those harmed by alleged criminal activity.

*Id.* (citation omitted).

We agree with the reasoning of the Florida court. *See also Gulf Coast Produce, Inc. v. Am. Growers, Inc.,* (S.D.Fla. No. 07–80633–CIV, Mar. 7, 2008) (unpublished order) (intentional tort claims such as fraud and conversion are not barred by the economic loss rule).

In this case, the trial court found the economic loss doctrine was inapplicable to Rhino's claims under the civil theft statutes, for conversion, and for return of the monies converted from an escrow account "because the agreements [did] not address Rhino's remedies in the event the collateral [was] diverted" and because Hutchins also had independent duties in tort to avoid converting the collateral proceeds and to honor the obligations of an escrow account. The trial court also found, with record support:

Hutchins directly or indirectly controlled the fund and each of the All Terrain signatories to the three contract documents.

. . . .

Two hundred thousand dollars of the proceeds were spent paying down a line of credit that All Terrain owed to Guaranty Bank and Trust Company, a line of credit for which Michael Hutchins was a personal guarantor and which was secured by land in Telluride, Colorado, for which Hutchins was the sole beneficial owner. By using $200,000 of the proceeds in this fashion, Hutchins directly benefited by $200,000 when he later sold the Telluride land.

. . . .

Instead of preserving the collateral proceeds to secure repayment of Rhino's loan, Hutchins decided to use the [specified collateral proceeds] to benefit himself, Mr. Pavek, and other creditors.

. . . .

Hutchins made the decision to use $200,000 of those proceeds to pay down All Terrain's line of credit and instructed Stonepine Accounting to do so. All Terrain's operating procedures required him to obtain the co-authorization of Charles Berling before spending $200,000 to pay down the line of credit, which co-authorization Berling never provided. Regardless, Hutchins spent $200,000 in that fashion. Doing so worked to his personal advantage because he was the sole beneficial owner of real estate pledged to secure repayment of that line of credit and because he had personally guaranteed repayment of the line of credit.

██ We agree. The economic loss rule applies where the plaintiff has an enforceable contractual remedy against the person or entity sought to be charged with liability. *Town of Alma,* 10 P.3d at 1264 n. 12 ("[T]he economic loss rule applies here to prohibit ... duplicate claims under tort and contract theories."); *see Grynberg v. Agri Tech, Inc.,* 10 P.3d 1267, 1270 (Colo.2000) ("[A]ll of the actions undertaken by [Agri Tech] in the instant case were called for in, and governed by, the contracts between the parties. [Agri Tech] did not provide any services to the Grynbergs that [it was] not already required

to provide by the terms of the contracts."). But here, Rhino has no contractual remedy against Hutchins for his conversion and civil theft because the contract was entered into by All Terrain and Rhino.

The trial court also found that Hutchins failed to perform the contractual requirement that the proceeds of the sale of the collateral be placed in an escrow account, and that he intentionally converted the funds to his own use. Because Hutchins's conversion and theft were based on acts independent of the contractual breach, the trial court correctly concluded the economic loss doctrine does not apply.

### IV. Did Rhino Have an Ownership or Property Interest?

■ Hutchins next contends the trial court erred in finding him liable to Rhino for conversion and civil theft because Rhino failed to prove the requisite ownership or property interest in the funds obtained from the sale of the collateral to support those claims. Under these circumstances, we disagree.

■■ Conversion is "any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Glenn Arms Assocs. v. Century Mortgage & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo.App.1984). An action will lie for the conversion of money where there is an obligation to return or otherwise particularly treat specific money. *See id.* (elements for claim of conversion were met where converter had not performed in accord with terms of contract and had placed funds to be escrowed elsewhere than in escrow, thereby exercising dominion over funds, and subsequently twice refused return of such funds); *see also Standley v. Am. Auto. Ins. Co.*, 136 Colo. 70, 314 P.2d 696 (1957) (concluding officers of a corporation may be held personally liable for conversion by diverting funds from their intended purpose and using them to pay the corporation's general obligations).

Hutchins's argument assumes that the money All Terrain received from Rhino was not a loan or that All Terrain had discretion in how Rhino's money was used. But the trial court found otherwise, stating that "All Terrain understood that Rhino's funds were to be treated as debt unless and until Rhino exercised the Ownership Option." We have upheld that determination.

■ We acknowledge that a lender normally does not have a cause of action against a borrower for conversion. This case also is distinguishable from *Glenn Arms Associates v. Century Mortgage & Investment Corp.*, 680 P.2d at 1316, where the plaintiff had advanced specific funds to a loan broker, apparently as an advance of the broker's commission for placing the loan. The plaintiff brought a conversion action against the broker after it diverted certain of those funds instead of placing them in an escrow account, as agreed, pending closing of the loan. A division of this court concluded in *Glenn Arms* that the elements of a claim of conversion were established because the broker "had not performed, and had placed the funds elsewhere than in escrow [as it had agreed to do], thereby taking dominion over the funds." *Id.* at 1317.

Here, although Rhino was merely a lender with a security interest in the proceeds of the collateral, the trial court found, with record support, that (1) All Terrain had an obligation under the agreements to deposit all proceeds from the sale of the six collateralized NPLs into an escrow account to secure repayment to Rhino unless and until Rhino's loan was repaid or Rhino converted the debt into equity by exercising its Ownership Option; (2) All Terrain led Rhino to believe it had complied with the collateral assignment; (3) none of the proceeds had been deposited into an escrow account or used to pay off Rhino's loan; and (4) All Terrain had never even opened an escrow account as it was required to do, despite its written assurances to Rhino that All Terrain had done so. The loan documents also show that Rhino had rights in the proceeds that were to have been escrowed.

Thus, All Terrain, acting through Hutchins, did not perform its obligation to place the proceeds of the collateral in escrow, "thereby taking dominion over the funds," which was underscored when Rhino's re-

quests for the return of its money were refused by Hutchins. *Id.* Accordingly, we conclude the elements for a claim of conversion were established in this case.

We also reject Hutchins's argument that he only took money, and that there can be no action for the conversion of money. *See Johnson v. Studholme,* 619 F.Supp. 1347, 1350 (D.Colo.1985), *aff'd sub nom. Johnson v. Hendricks,* 833 F.2d 908 (10th Cir.1987).

In *Burke v. Napieracz,* the Florida court stated:

> [The defendant] was to receive *specifically identifiable* social security funds, deposit those funds in an identifiable bank account, and forward the funds to [the plaintiff]. He was not authorized to withdraw monies from the account except as specifically authorized by [the plaintiff]. Breach of the agreement herein would have consisted of his failure to either deposit the social security checks and/or to provide the funds to [the plaintiff] as requested. In either case, damages for the breach of contract would be based upon the failure to perform either of these obligations. Herein, however, [the defendant] not only failed to forward money from [the plaintiff's] social security checks, but he allegedly took such funds for his own personal use.

674 So.2d at 758 (emphasis added).

Similarly, here, Hutchins took "specifically identifiable" funds, namely, the proceeds from the collateral that were to be used to secure Rhino's loan. *Id.* He had the responsibility to direct those funds, but instead of placing them in escrow as required, he used a large portion of the funds to pay corporate debts or obligations and to benefit himself and his family. Hutchins's action in diverting the proceeds of the NPL's for his own use also established the elements of civil theft, because the NPL proceeds constituted "property obtained by theft" and Rhino had an ownership interest in such property. *See* § 18–4–405, C.R.S.2007.

We therefore reject Hutchins's contention that Rhino failed to prove the requisite ownership or property interest to support its claims for conversion and civil theft.

### V. Proceeds Paid to Law Firm

██ Hutchins's final contention is that the trial court erred in finding him liable to Rhino for the portion of NPLs' proceeds that was retained by Pavek's law firm. According to Hutchins, he never had the requisite dominion or control that is required for conversion or civil theft, because this portion of the proceeds was never turned over to All Terrain, but was paid to the law firm at Pavek's request. However, the trial court found, with record support, that Hutchins expressly authorized Pavek to retain those proceeds and that Hutchins had final authority to determine how the proceeds would be treated. Therefore, the trial court did not err in finding Hutchins liable for the portion of the proceeds used to pay the law firm.

Judgment affirmed.

Judge HAWTHORNE and Judge TERRY concur.